**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| TEMPUS LABS, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 23-cv-2947 |
| | ) | |
| SANDEEP PAWAR, an individual, | ) | |
| | ) | |
| Defendant. | ) | |

**VERIFIED COMPLAINT**

Plaintiff Tempus Labs, Inc. ("Tempus") for its Verified Complaint against Defendant Sandeep Pawar ("Pawar" or "Defendant") states as follows:

**INTRODUCTION**

1.      A mere two weeks after fraudulently inducing Tempus to issue him a new employment agreement with no post-employment restrictive covenants, Pawar abruptly resigned from his high-level role with Tempus to take a similar role with direct competitor Caris Life Sciences ("Caris"). Indeed, Pawar's new title with Caris is nearly identical to those he held with Tempus. Pawar also brazenly accessed, printed, and took copies of highly confidential and competitively sensitive documents the day before he resigned. Armed with the knowledge learned over years of working closely with Tempus' most valuable information and actual copies of Tempus' proprietary information, Pawar is uniquely positioned to try to improperly leverage this knowledge to attempt to bring Caris to the next level in a highly specialized and competitive industry.

2.      Using real-world data, cutting edge technology, and artificial intelligence, Tempus assists healthcare providers and life sciences companies in the fight against cancer and other

chronic diseases.  In pursuit of this goal, Tempus has invested considerable financial resources, years of trial and error, and sweat equity to build one of the world's largest and most complex libraries of molecular and clinical data.  Tempus' data and technology have the potential to usher in a new era of precision medicine (also known as "personalized medicine"), helping to accelerate the development of new personalized therapies and insights so that patients can benefit from treatments tailored to their unique and individualized characteristics.

3.      Tempus' competitive position in the marketplace is due, in part, to the resources it has expended in developing and maintaining its technology, trade secrets, and confidential information.  Along with specialized training, Tempus provides its key employees with access to this confidential information and trade secrets.

4.      Pawar, by the very nature of his position at Tempus, was exposed to Tempus' most sensitive confidential information and trade secrets, particularly as it pertains to Tempus' data business and related strategy.  As described on his own LinkedIn page, Pawar was "responsible for long range planning and [Tempus'] data product roadmap to grow and improve Tempus' data and artificial intelligence ("AI") offerings."[1]

5.      In addition to providing him nearly unfettered access to its most sensitive information, Tempus promoted Pawar, allowed him to relocate to California, elevated his compensation, and trained him in a new area of the business.  In doing so, Tempus relied upon Pawar's affirmations of loyalty and commitment to help Tempus further its goal of building the top data-driven healthcare technology company in the world.

6.      Because Tempus valued Pawar as an employee, and trusted the representations he made to Tempus, it did not question his request for a new Confidentiality, Intellectual Property,

---

[1] *See* S. Pawar LinkedIn page, available at: linkedin.com/in/sandeep-pawar-73209a26/details/experience/ (last accessed on May 9, 2023).

and Protective Covenants Agreement ("CIPPA") in April 2023. In reality, Pawar falsely represented he needed a new CIPPA based on a request by the United States Citizenship and Immigration Services ("USCIS") related to his application for permanent residency. Pawar's representations were, in reality, outright lies designed to obtain a CIPPA without restrictive covenants so he would be "free" to join Caris.

7.      Two weeks later, Pawar printed out a trove of highly-sensitive and confidential documents containing pricing and pricing guidelines, Tempus' customer information, project proposals, and statements of work, among other proprietary documents and information, from Tempus' network. The very next day, he tendered his resignation to Tempus to take a role with Caris as its Vice President, Data Strategy and Solutions where he would "be getting back into data," and he acknowledged to his former Tempus colleagues that Caris hired him to perform a similar, data-focused role at Caris.

8.      Caris, which is one of very few direct competitors of Tempus in terms of type and breadth of offerings, and a recent entrant to the world of aggregating molecular and clinical data, is actively trying to build what Tempus already has. In recent years, Caris has launched its own version of a molecular and clinical database that is similar to what Tempus has operated for years.

9.      Pawar will be unable to perform his role at Caris without relying on and using years' worth of confidential, proprietary and trade secret information learned at Tempus. Why else would Caris promise to compensate Pawar well above market if not to leverage his knowledge of Tempus' trade secrets to "skip the line" and unfairly gain market share? By hiring Pawar, Caris does not have to endure years of trial and error to build a cutting edge and innovative data business that could compete with Tempus in this space.

10. To prevent further harm to Tempus' confidential, proprietary, and trade secret information, this Court must immediately enjoin Pawar from working for Caris in a strikingly similar position to the one he held at Tempus.

## PARTIES

11. Tempus Labs, Inc. is a Delaware corporation with its principal place of business in Chicago, Illinois. Tempus is a citizen of Illinois.

12. Sandeep Pawar is an individual who formerly resided in Illinois and now resides in California. For jurisdiction purposes, Pawar is a citizen of California.

## JURISDICTION AND VENUE

13. Jurisdiction is proper in this district pursuant to 28 U.S.C. § 1331.

14. There is federal question jurisdiction under the federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, *et seq.*

15. There is also diversity jurisdiction based on the diversity of the citizenship of the parties with an amount in controversy exceeding $75,000 consistent with 28 U.S.C. § 1332.

16. Venue is proper in this District under 28 U.S.C. § 1391, *et seq.,* because Pawar breached his duty of loyalty and misappropriated Tempus' trade secrets, the effects of which Tempus felt in Illinois. These acts subject Pawar to personal jurisdiction in this District.

## GENERAL ALLEGATIONS

**Tempus' Business**

17. Tempus is a Chicago company that was founded in 2015. In the relatively short amount of time it has existed, Tempus has revolutionized medical care by combining next generation sequencing, real-world data, technology, and artificial intelligence.

18. Tempus has developed a portfolio of tools that transform healthcare data into

-4-

actionable insights for physicians, academic researchers, and life sciences companies. Driven by data and real-world evidence, Tempus helps make precision medicine a reality.

19. Tempus is a healthcare technology company. While its business is multifaceted in this respect, its two main business product lines are its (1) genomic sequencing testing and related genetic testing operations (collectively referred to as the "Genomic Sequencing business") and (2) its data licensing business (the "Data business").

20. Under its Genomic Sequencing business, Tempus provides next generation sequencing ("NGS") and analyzes patients' DNA and RNA data to help identify potential treatment options based on the patients' unique genomic makeup, primarily for late stage cancer patients. Tempus currently offers NGS tests in oncology, neuropsychology, and infectious diseases (including COVID-19). Tempus' tests are used for both clinical and research purposes. The data generated through these tests feed into Tempus' data library.

21. Through its Data business, Tempus leverages the de-identified, multi-modal datasets it collects and maintains through its Genomic Sequencing business, healthcare providers, and other sources, to enable physicians to make data-driven treatment decisions, to accelerate research, drug discovery, and development, and to drive innovations in precision medicine. Tempus has built a proprietary technology platform that aggregates, abstracts, structures, and de-identifies data to facilitate the deployment of AI at scale.

22. Healthcare providers and life sciences companies access this data to craft tailored treatment options and to advance precision medicine research in highly specialized disease categories.

23. Tempus has amassed what it believes is the largest de-identified database of clinical and molecular data of cancer patients in the world. Tempus' library of clinical and molecular

information contains de-identified data related to over five million oncology patients, including treatment and outcome information, in order to power evidence-based studies. Tempus' proprietary platform contains millions of de-identified patient records with multi-modal data, including imaging data, matched clinical records linked with genomic information, and full transcriptomic profiles.

24.     Tempus' ever-expanding data library, and its ability to effectively leverage this data, is critical to its mission and its success as a company.

25.     In its Data business, Tempus licenses this de-identified data to life sciences companies to assist in those companies' pursuit of novel therapeutic treatments, clinical trials, and other healthcare innovations. These customers utilize Tempus' datasets and proprietary technology to filter and search Tempus' data library by any number of metrics, such as demographics, genetic biomarkers, and gene expressions. These datasets and proprietary technology allow life sciences companies to discover previously undiscoverable trends, identify clinical patterns, and characterize genetic mutations and diseases on a molecular level. Tempus' proprietary technology also enables life sciences researchers to unlock insights from the data that were previously inaccessible, such as creating AI and Machine Learning models to predict future outcomes and responses to therapeutic innovations.

26.     This data retains competitive and economic value for years considering the substantial investment it takes to create the technology as well as the fact that it takes, on average, seven years to successfully bring a drug to market. Thus, this data and the information and insights life sciences companies obtain from use of Tempus' data and proprietary technology is valuable to a competitor for years; it does not go stale in a short period of time.

27.     And, because information collected in its Genomic Sequencing business is

structured for inclusion in its data library, this data can be further utilized to match patients who utilized Tempus' NGS testing services to potential treatments or clinical trials. This complete integration of Tempus' Data and Genomic Sequencing businesses has been crucial in Tempus establishing itself in the niche and highly competitive Genomic Sequencing and Healthcare Data & Artificial Intelligence industry.

28. Tempus also operates a Modeling Lab in Chicago, one of only a few of its kind, which contains the world's largest library of human *ex vivo* (*i.e.*, living outside the body) cancer tissue, or tumor-derived "organoids." Through the Modeling Lab, Tempus grows and reproduces these 3D organoids which can be used for targeted drug screenings, for example to test the efficacy or toxicity of a drug, and other research and development projects. Tempus tailors its Modeling Lab to its customers' needs. Through its Modeling Lab, Tempus is transforming therapy selection and drug discovery and development.

29. The Modeling Lab is closely intertwined with Tempus' Data business and complements its Genomic Sequencing business. The research, data, and information gleaned from the Modeling Lab necessarily informs Tempus' larger Data business, the data accessible to Tempus' customers, and expands its ever growing and rapidly evolving data library.

30. There are very few other companies using their own library of clinical and molecular data to power precision medicine research, and even fewer who do so while also operating a large-scale genomic sequencing laboratory – as Tempus does.

31. Given the relatively small number of companies that operate in the same space as Tempus, competition is fierce. Companies like Tempus operate in a nascent industry, where options are limited and prospective customer spend is finite. Tempus has been able to gain a competitive edge through massive investment, its extensive and targeted training of its employees,

its strategic and thorough monitoring and planning of operations, its commitment to and development of customer relationships and understanding customer goals and needs, its ongoing and continuing development of cutting-edge technology, and its continuous ability to master the way data plays a role in improving patient outcomes. Tempus has raised more than $1 billion, which it has invested in substantial research and development efforts.

32.     Tempus has also differentiated itself by elevating its user experience. Although there are competitors in the industry maintaining data libraries similar to Tempus', most competitors have been unable to provide a useful format and experience for their customers. Since launching its Data business years ago, Tempus has made significant strides in making its data library format more usable, and in providing services to data licensing customers that help them more easily leverage the information from Tempus' data library.

33.     Tempus' progress and success in this area is a result of multiple years of experience and significant investment. Tempus' data library and platform is the fruitful end-product of years of trial and error in building various data models, refining those models and the data contained therein, and refining access strategies and the overall customer experience in actually using and extracting this data for their needs.

34.     In the course of developing and strengthening its operations for its Data business, Tempus has invested extensive and substantial resources, time, and expense in developing its trade secrets and in ensuring its reputation and relationships with customers and other business contacts remain pristine.

35.     A key component of this pursuit are those individuals to whom Tempus exposes confidential information and trade secrets and to whom Tempus' provides complex data training. Those who work closely with Tempus' Data business, like Pawar, are integral.

**Tempus Protects Its Confidential, Proprietary and Trade Secret Information**

36.     Tempus takes serious measures to protect its confidential information and trade secrets.  As a matter of course, it requires its employees to sign non-disclosure and confidentiality agreements.  It limits access to its confidential information and trade secrets to certain levels of employees, depending on their duties and responsibilities.

37.      Tempus utilizes multiple security systems to protect this information.  All Tempus information is password-protected and requires two-factor authentication.  In addition, Tempus leverages numerous third-party software systems to protect the integrity of its proprietary systems and data.  By way of example only, Tempus utilizes Okta (which manages all user accounts and authentication), Crowdstrike (which monitors endpoint security for potential breaches and unauthorized use of information), WorkspaceOne (which manages all endpoint device settings to prohibit unauthorized usage), and Tanium (which provides advanced threat detection and response capabilities for endpoints).

38.     Tempus requires employees to attend trainings and affirm their commitment to Tempus' code of conduct and other core non-disclosure policies.  For example, the Tempus Employee Handbook and Code of Conduct, to which Pawar acknowledged and agreed, contains numerous provisions related to exposure to and protection of Tempus' Confidential Information.  It requires employees to adhere to "Tempus' policies and procedures on confidentiality and [Protected Health Information ("PHI")], whether in this handbook or elsewhere, and keep your desk free of business-related paperwork and PHI when you leave your work area for extended periods of time.  When you leave for the day, make sure all confidential materials are locked and secured, or are otherwise secured according to company procedure.  Whiteboards must be wiped clean of any confidential information after use.  At the end of the day, desktop monitors must be

logged out and turned off, and laptops must be locked away, or taken out of the office with the owner. Laptops cannot be left out on employee desks…. The unauthorized release of confidential information can result in disciplinary action, up to and including termination, legal remedies available to Tempus, and other consequences."

**Pawar's Roles at Tempus**

39.     Tempus hired Pawar on or around August 28, 2019 as its Director, Strategic Operations located in Chicago, Illinois. Pawar's first day of employment was October 7, 2019.

40.     In his role as Director, Strategic Operations, Pawar led Tempus' Data Partnerships Program. Pawar worked directly with Tempus' core data partners and internal and external stakeholders to become intimately familiar with their business, services, needs, and asks so that Tempus met all of their objectives. Pawar extensively engaged with industry partners to understand their research needs so that he could develop project specifications, define trial cohorts, and actively manage project execution.

41.     In this role, Pawar also worked with Tempus' cross-functional teams to thoroughly understand and support the end-to-end process from data receipt to potential export, including suggesting ways to improve Tempus' Data model (the "Data Model") so that its customers could derive value and insight from Tempus' data. Pawar led multiple teams and projects focused on delivering health economics and outcome analyses to Tempus' research partners. Further, Pawar partnered with Tempus' data science teams to have a strong working knowledge of Tempus' clinical and molecular data, which he used to determine key outcomes for Tempus' customers.

42.     In or around October 2020, Tempus moved Pawar into the role of Director, Alliance Management. The responsibilities of this role built on his previous role.

43.     In this role, Pawar led and managed Tempus' Alliance Management Team.  This was a key position at Tempus – Pawar was literally charged with ensuring the success of Tempus' Data business customers.

44.     Tempus' Alliance Management Team, which consisted of eight direct reports at the time Pawar held this role, is responsible for highly important customer success functions.  This team works with Tempus' customers to onboard them to Tempus' data platform, provide extensive training to the customer team on using Tempus' data library, help identify each customers' unique and specialized research needs, and work intimately with customers as they navigate Tempus' data library.

45.     Those on the Alliance Management Team, including Pawar, are extensively trained on and familiar with the full suite of Tempus' data offerings.  They are so intimately familiar with how Tempus' proprietary platform operates, they can train others.

46.     Through their relationships with Tempus' customers, the Alliance Management Team understands each customer's research and development interests and their patient targets.

47.     In this role, Pawar was responsible for helping train customers how to navigate and use the data library.  This role required Pawar to access confidential information relating to Tempus' customers and prospective customers, including Tempus' largest and highest revenue producing customers.  Pawar understood Tempus' customers' problems, needs, wants, pain points, and research targets on the most detailed level.

48.     Of course, Pawar also had access to Tempus' proprietary software which allows a user to efficiently sort and review over five million de-identified patient records to gain insights, conduct research, and identify drug and treatment outcomes.

49.     Tempus' data library and proprietary software, its development, and its operation, is the essence of Tempus' trade secrets and most confidential information.

50.     Through this role (and others) with Tempus, and the extensive training Tempus provided him, Pawar understands (1) how to collect data from various sources; (2) what data is important and necessary (and what is not); (3) how to extract the important data from petabytes of insignificant data; (4) how Tempus abstracted, structured, and de-identified the data for customer use; and (5) how to communicate with and train customers to use this data in the most efficient and effective manner.

51.     Pawar is armed with the necessary knowledge to rebuild Tempus' Data business and product without investing years of time and resources into the process.

52.     This knowledge, and the information to which Pawar was exposed relating to customers' interests, research and development initiatives, and other programs, has a long shelf-life as most of these initiatives continue for years at a time.

53.     In addition to the above, Tempus gave Pawar access and exposure to a variety of its confidential and trade secret information.  Most importantly, Pawar had detailed access to and information about (1) Tempus' existing proprietary products; (2) Tempus' product development roadmap, which was created in response to detailed market feedback from Tempus' customers; and (3) detailed customer information contained in Tempus' customer relationship management platform, Salesforce.

54.     Through Salesforce, Pawar had knowledge of customer and prospect identities, pricing structures, services provided, and feedback, among other information.

55.     On or around July 9, 2021, Tempus changed Pawar's title to Head, Data Product Strategy.  And then, on or around October 18, 2021, Tempus changed Pawar's title to Head, Data Growth & Operations Strategy.

56.     Pawar requested to relocate to Tempus' Redwood City, California office in or around July 2021.  Tempus granted this request.

57.     After relocating to California, Pawar continued to visit Tempus' headquarters in Chicago, Illinois.  In the 5 months preceding his resignation, Pawar visited Chicago at least 4-5 times.

58.     Pawar also continued to work closely with Tempus' Illinois-based employees.  The majority of Tempus' employees are located in Chicago, Illinois.

59.     In these roles, Pawar still managed the Alliance Management Team, but he was also charged with "long range planning," Tempus' "data product roadmap to grow and improve Tempus' data and AI offerings," and "assessment, design and tactical execution of multi-quarter initiatives."[2]

60.     These roles were focused on data growth and strategy.  Pawar was able to leverage what he learned in leading the Data Partnerships Program and managing the Alliance Management Team and use those learnings to further enhance Tempus' Data business and offerings to customers.

61.     Pawar managed and collaborated with different teams across the organization in these roles, allowing him to learn even more about Tempus' product development, engineering,

---

[2] *See* S. Pawar LinkedIn page, available at: linkedin.com/in/sandeep-pawar-73209a26/details/experience/ (last accessed on May 9, 2023).

and the future direction of the business. In his own words, Pawar worked with and had knowledge of "data growth," "customer success," and "data provisioning functions."[3]

62.    Pawar assisted Tempus in developing its Data Model to be a highly customized way to structure de-identified data to make it useful for life sciences researchers.

63.    Pawar continued to have access to Tempus' customer information, prospective customer information, and the Data business in this role.

64.    On or around February 24, 2022, Tempus promoted Pawar to the role of Senior Director, Data Growth & Operations Strategy. Pawar also received a raise in connection with this promotion. In this role, Pawar managed Tempus' Modeling Lab's Project Managers.

65.    Tempus' Modeling Lab's sales team is responsible for securing customer contracts to grow tumor organoids and use "other novel technological applications" in Tempus' physical "wet lab" for targeted drug screening, research, and development.[4] These organoid projects frequently combine the organoid "wet lab" work with Tempus' data, as life sciences companies seek to further delve into the data they license from Tempus by performing experiments to further test the insights they have derived.

66.    As explained by Pawar, "these programs support R&D for [Tempus'] pharma and biotech partners through biomarker discovery, drug candidate assessment, and pipeline prioritization."[5] Indeed, "these studies may . . . bring about positive change in therapeutic options for the patients [Tempus] serve[s]."[6]

67.    As the Senior Director, Data Growth & Operations Strategy, Pawar had access to a high-level view of the entirety of the Modeling Lab's operations as well as the highly confidential

---

[3] *Id.*
[4] *Id.*
[5] *Id.*
[6] *Id.*

research priorities of Tempus' customers. In addition to the ongoing projects and programs in the Modeling Lab, Pawar had intimate knowledge of the equipment used in the Modeling Lab, and he approved all Statements of Work for each customer. Pawar also had intimate insight into customers' ongoing research and development targets, their specific needs, and forecasting of various customer initiatives.

68. Tempus viewed the Senior Director, Data Growth & Operations Strategy role as Pawar's next step toward larger leadership positions within the Company. In discussions with Pawar, and based on Pawar's representations to Tempus, Tempus placed him in this role specifically to expedite Pawar's path to high-level company leadership and increased responsibility.

69. As continued recognition of Pawar's dedication to and work for Tempus, Tempus provided Pawar a nearly 5% pay increase and 2022 Cash Incentive Bonus payout in or around February 2023 as part of his annual review.

**Pawar's Confidentiality and Protective Covenant Agreements with Tempus**

70. Pawar entered into various agreements to protect Tempus' trade secrets, proprietary and confidential information, and customer and employee relationships throughout his employment with Tempus.

71. On or around August 26, 2019, in connection with Tempus' offer of employment to Pawar, Tempus presented Pawar with a copy of its Confidentiality, Intellectual Property and Restrictive Covenants Agreement (the "CIPRA") for his consideration and execution.

72. On August 28, 2019, Pawar executed the CIPRA. He was an Illinois resident at the time he executed the CIPRA.

73. In exchange for executing the CIPRA, Tempus provided Pawar continued employment, a base salary of $165,000, and 3,000 restricted stock units ("RSUs"). *See* Exhibit A.

74. In pertinent part, the confidentiality and non-disclosure provisions of the CIPRA provide:

1. Proprietary Information. My employment status creates a relationship of confidence and trust between Tempus and me with respect to any information that is not generally known to the public or is otherwise treated by Tempus as confidential or proprietary and is: (a) applicable to the business of Tempus or its subsidiaries; or (b) applicable to the business of any client or customer of Tempus or its subsidiaries, which may be made known to me by Tempus or by any client or customer of Tempus or its subsidiaries, or learned by me in such context during the period of my employment.

All such information has commercial value in the business in which Tempus is engaged and is hereinafter called "Proprietary Information." By way of illustration, but not limitation, Proprietary Information includes any and all technical and non-technical information including patent, copyright, trade secret, and proprietary information, techniques, sketches, drawings, models, inventions, know-how, processes, apparatus, equipment, algorithms, software programs, code, software source documents, flowcharts, tools, architectures, databases, menu layouts, routines, formats, data compilers and assemblers, and formulae related to the current, future and proposed products and services of Tempus or its subsidiaries, and including, without limitation, respective information concerning research, experimental work, development, design details and specifications, engineering, financial information, procurement requirements, purchasing manufacturing, customer lists, business forecasts, sales and merchandising and marketing plans and information. "Proprietary Information" also includes proprietary or confidential information of any third party who may disclose such information to Tempus or to me under any obligation of confidentiality in the course of Tempus's business.

2. Ownership and Confidentiality of Proprietary Information.

(a) All Proprietary Information is the sole property of Tempus, Tempus's assigns, and Tempus's customers, and Tempus, Tempus's assigns and Tempus's customers shall be the sole and exclusive owner of all patents, copyrights, mask works, trade secrets and other rights in the Proprietary Information. . . .

(b) At all times, both during my employment by Tempus and after termination of such employment, I will keep in confidence and trust all Proprietary Information, and, except as necessary to meet Tempus's business needs, I will not: (i) use any Proprietary Information; (ii) directly or indirectly permit a third

party to obtain access to any Proprietary Information; or (iii) transmit or disclose any Proprietary Information to any person, concern or entity. Further, I shall not make use of any Proprietary Information, directly or indirectly, for myself or for others, including, without limitation, in connection with any other employment or consulting capacity. In the event I believe I must disclose or otherwise make available Proprietary Information to any third party in order to meet Tempus's business needs, I shall inform Tempus prior to any such disclosure in order that Tempus may enter into a confidentiality or similar agreement with such third party.

(c) All non-disclosure obligations of paragraph 2(b) above shall apply (i) as to Proprietary Information other than trade secrets, at all times during my employment and for two (2) years after termination of such employment, and (ii) as to trade secrets, for as long as such trade secrets retain their status as a "trade secret" under applicable law.

*Id.*

75.     In pertinent part, the Non-Compete provision of the CIPRA provides:

(a) "Restricted Months" is defined as 18 months from the Date of Termination. Date of Termination is the date recorded in Tempus's internal Human Resources Information Systems that my employment was terminated with Tempus.

(b) While employed by Tempus and during the Restricted Months, without regard to the reason my employment terminates (the "Non-Compete Period"), I will not, other than on behalf of Tempus, directly or indirectly, and whether or not for compensation, without the prior written consent of Tempus, . . . be employed by any entity in the Geographic Area (as defined below) which is in competition with Tempus, with which I would hold a position with responsibilities similar to any position I held with Tempus during the 12 months preceding the termination of my employment or relationship with Tempus or in which I would have responsibility for and access to confidential information similar or relevant to that which I had access to during the 12 months preceding the termination of my employment or relationship with Tempus.

(c) The Geographic Area shall mean anywhere in the United States or the world where Tempus or any subsidiary of Tempus conducts business or has active plans to conduct business directly or through its affiliates.

*Id.*

76.     Pawar acknowledged the terms of the CIPRA were reasonable. *Id.*

77.     In February 2021, Tempus presented Pawar with a CIPPA in connection with a salary increase.  *See* Exhibit B.

78.     On February 14, 2021, Pawar executed the CIPPA in connection with his salary adjustment (the "2021 CIPPA").  In exchange for executing the 2021 CIPPA, Tempus provided Pawar continued employment, increased compensation, and other benefits.  The 2021 CIPPA superseded the CIPRA.

79.     In pertinent part, the Confidentiality of Proprietary Information and Innovations provision of the 2021 CIPPA provides:

> a. *Confidential and Proprietary Information*. Your job requires you to be exposed to confidential or proprietary information ["CPI"] of Tempus, its subsidiaries, and other third parties, including technical and commercial information related to Tempus, its customers', or its prospective customers' business that is not generally known to the public. CPI includes, among other things, all patent applications, trade secrets, and other intellectual and tangible property rights in all Innovations. CPI also includes proprietary or confidential information of any other third party who may disclose such information to Tempus or to you under any obligation of confidentiality in the course of Tempus' business, including protected health information and personal data protected by applicable law. CPI is valuable to Tempus and the core of our business. Employees who will be exposed to CPI must sign an agreement before joining our team to protect CPI.

> b. *Ownership of and Obligations Regarding Innovations*.

> . . .

> ii. You agree to keep all CPI that you encounter in strict confidence, even after you leave Tempus. You cannot use CPI for your own purposes, you cannot take CPI with you if you leave (in fact, you are required to give it back or destroy it), and you cannot disclose CPI to any third party unless required to do so as part of your job at Tempus, or because of a legitimate law enforcement demand.

*Id.*

80.     The Protective Covenants provision of the 2021 CIPPA provides, in pertinent part:

> a. *Non-Compete*. As a member of Tempus' team, we are going to invest substantial resources in your training. We are also going to expose you to our CPI. We need to ensure that you will not use CPI for non-Tempus purposes while you work here or

after you leave, whether intentionally or inadvertently. As a result, you agree that while employed by Tempus and for 12 months after you leave, you cannot do either of the following without our advance written consent:

. . .

ii. carry out activities that are the same or substantially similar to the activities you carried out at Tempus at any time during the last twelve (12) months of employment with Tempus in any executive or upper management capacity or in any capacity in which you could use, reference, or disclose CPI for any business that competes with Tempus in any geographic area in which Tempus conducts business or has active plans to do so. A business "competes" with Tempus if it offers products or services (a) for use in precision medicine or data or artificial intelligence-driven healthcare or health research, and (b) similar to those offered or planned to be offered by Tempus as of your last day of employment with Tempus. For illustration, this definition would exclude companies that are not in competition with Tempus because they do not offer the types of services or products described in clause (b) in the preceding sentence, which could include organizations such as certain healthcare providers, payers, and pharmaceutical developers. This definition would include, for example, certain genomic sequencing laboratories, developers of artificial intelligence software for healthcare, and companies that aggregate and structure healthcare data for research use.

*Id.*

81.     Pawar acknowledged the terms of the 2021 CIPPA were reasonable.

82.     In reliance on Pawar's numerous affirmations in the 2021 CIPPA, Tempus continued to provide Pawar with access to its confidential, proprietary, and trade secret information.

83.     Pawar acknowledged the CPI to which he had access is confidential and proprietary, and the goodwill of Tempus or customer or supplier relationships which Pawar enjoyed while employed at Tempus are significant and valuable to Tempus.

**Pawar's Fraudulent and False Statements Immediately Prior to His Resignation**

84.     On April 1, 2023, Pawar utilized Tempus' "Envoy" platform to liaise with Tempus' immigration attorney regarding his EB-1 Category Green Card application.

85.     Through the Envoy interactive platform, Pawar stated: "I have recently been approved for EB-1 green card pending response to a contract related question in a RFE. The question states that I am a California resident and my contract has Illinois based signature and CIPRA (non compete and non disclosure document) associated with it. The USCIS officer has asked whether Tempus is compliant with California law and if not has asked for an amendment to the contract. How should I go about responding to this inquiry? . . . Would it be helpful if I ask Tempus to provide a revised contract with change of assignment that has a CIPRA and location mentioned which is compliant with California law?" *See* Exhibit C.

86.     In response, Tempus' immigration counsel asked Pawar for a copy of the Request for evidence ("RFE"), which he did not provide. Instead, Pawar indicated he would reach out directly to Tempus' People Team. *Id*.

87.     This same day, Pawar contacted Tempus' People Team via email and represented the following:

   a. His EB-1 Category Green Card had been approved "subject to a proper response to a RFE [request for evidence]" from USCIS.

   b. He needed a "revised CIPRA which is compliant with California law and shows [him] as a California resident."

   c. USCIS approved his "change of location amendment" but his "contract" also needed to be updated.

*See* Exhibit D.

88.     On April 5, 2023, in response to questions from Tempus' People team regarding the need for a new employment agreement when an updated employment verification letter should suffice, Pawar made the following statements via email:

   a. "[F]or a permanent Resident card to be issued to an immigrant, the title and job description, along with CIPRA (based on location of work for immigrant employee) have to match what is being filed."

   b. "[T]he USCIS office has for a change to match in his [sic] Request for Evidence" in the form of a California-compliant CIPRA.

*See id.*

89. Pawar never provided Tempus with a copy of the USCIS RFE or any other documentation from USCIS corroborating his request or representations.

90. At first, the People Team declined Pawar's request because Tempus typically only updates employment agreements during a compensation cycle and when an employee receives some type of consideration in return. However, Pawar persisted, and based on the trust between Tempus and Pawar and his express statements regarding his Green Card status to the company, Tempus provided Pawar with a CIPPA governed by California law (the "CA CIPPA") on April 6, 2023, which he executed that same day. *See* Exhibit E. In executing the CA CIPPA, Pawar acknowledged its terms were reasonable.

91. The CA CIPPA, of course, did not include a non-competition provision. On the same day, April 6, 2023, Pawar asked Tempus' People Team if "the revised California CIPRA," "supersedes the original one." Tempus confirmed it did. *See* Exhibit D.

92. In pertinent part, the Confidentiality of Proprietary Information and Innovations provision of the CA CIPPA provides:

  a. C*onfidential and Proprietary Information.* **Your job requires you to be exposed to [confidential and proprietary information ("CPI")] of Tempus, its subsidiaries, and other third parties, including technical and commercial information related to Tempus, its customers', or its prospective customers' business that is not generally known to the public. CPI includes, among other things, all patent, trade secret, design, copyright, trademark, and other intellectual and tangible property rights in all Innovations. CPI also includes proprietary or confidential information of any other third party who may disclose such information to Tempus or to you under any obligation of confidentiality in the course of Tempus' business, including protected health information and personal data protected by applicable law. CPI is valuable to Tempus and the core of our business. Employees who will be exposed to CPI**

must sign an agreement before joining our team to protect CPI.

b. *Ownership of and Obligations Regarding Innovations*.

. . .

v. You agree to keep all CPI that you encounter in strict confidence, even after you leave Tempus. You cannot use CPI for your own purposes, you cannot take CPI with you if you leave (in fact, you are required to give it back or destroy it), and you cannot disclose CPI to any third party unless required to do so as part of your job at Tempus, or because of a legitimate law enforcement demand.

Exhibit E.

93.     Unlike the CIPRA or 2021 CIPPA, the CA CIPPA did not contain any post-employment non-competition restrictions.

94.     Upon information and belief, Pawar never received a RFE from USCIS requesting an "amended" or "California compliant" CIPRA or CIPPA.  Instead, Pawar knowingly lied about a request from USCIS to Tempus and Tempus' immigration counsel so that Tempus would issue him the CA CIPPA.

95.     Two weeks later, on April 21, Pawar tendered his resignation.  This day was Pawar's last day of employment with Tempus.

96.     Pawar told Tempus he was considering an offer from Caris that would "get him back into data."

97.     On April 20, the day before he resigned, Pawar printed a number of highly confidential Tempus documents, including, but not limited to:

a.  Tempus' 2023 Data Product Pricing Guide, which contains Tempus' specific pricing information and guidelines as well as team feedback and plans to further build out Tempus' pricing structure, plans, and guidelines;

b.  Tempus' Post-Sale Services document, which details Tempus's pricing, projected revenue and profit, plans, and team feedback concerning certain offerings;

c. A client-commissioned study based on data, outcomes, and analyses collected, performed, and reviewed by Tempus;

d. Proposals for client-commissioned projects, including detailed milestone projections and estimated hours and costs;

e. Life Science Data Deliveries document, covering customer feedback concerning Tempus' quality assurance and quality control efforts, identified success criteria, a detailed path forward identifying short-term and long-term goals, and team feedback and collaborative thoughts on accomplishing identified goals and certain issues presented; and

f. A document detailing Tempus' client deliverables, identified issues needing to be solved related to such deliverables, and Tempus' recommendations and ideas to overcome such issues.

98. Of concern, Pawar had no legitimate business reason to access and/or print these documents in relation to his then-current role at Tempus.[7] And, Pawar had no legitimate business purpose to print these documents when he intended to resign the next day. Historically, Pawar rarely ever printed documents on Tempus' systems in the course of his employment. For example, between January 2022 and April 20, 2023, Pawar printed approximately 150 documents. Approximately 130 of these were personal in nature (*e.g.*, photographs, travel reservations, passport scans, retail return forms). At least 8 of the approximately 20 non-personal documents Pawar printed from Tempus' systems in this time period were printed on April 20, 2023—the day before his resignation. And none of these 8 documents were personal to Pawar or non-Tempus related.

99. These documents are highly valuable to a competitor because they contain specific plans, client needs, proposals, pricing, and projections that Tempus carefully crafted and poured

---

[7] Counsel for Pawar confirmed that Pawar printed these documents on April 20, 2023, but in an apparent attempt to downplay the seriousness of Pawar trying to cover his tracks, his counsel also represented that Pawar shredded these documents. Notably, Pawar's counsel did not specify when Pawar supposedly shredded the documents. And, Pawar's Counsel also represented Pawar printed these documents in the ordinary course of his role in the Modeling Lab, which is inaccurate and implausible.

substantial sweat equity and monetary means into to place itself ahead of the competition. These documents provide the level of detail a competitor needs to unfairly edge out the competition (*i.e.*, Tempus). Simply put, these documents are a competitor's roadmap to undercut Tempus, mirror its plans, and steal its customers.

**Pawar's Employment with Caris**

100. Although it entered the data licensing business after Tempus, Caris seeks to use real-world data and analytics to assist physicians in providing and life sciences companies in advancing precision medicine.

101. Like Tempus, two of Caris' primary product lines are (1) its sequencing business; and (2) its data licensing business.

102. Caris develops and performs tests that perform genetic sequencing tests to assist physicians in providing precision medicine to their patients.

103. Caris claims to maintain a library of molecular and clinical data from patient profiles, which it markets to life sciences companies for purposes of research and development.

104. In October 2020, Caris tried to launch its own version of a real-world, clinical-molecular database called "CODEai," several years after Tempus had launched its own platform and had already begun licensing de-identified data to life sciences companies. Caris claimed its database, like Tempus', "leverages [] extensive genomic, transcriptomic and proteomic information and matches it with clinical outcomes to take data and transform it to provide never before seen insights into the treatment of cancer by molecular composition."[8] In other words,

---

[8] *See* Caris CodeAI News, https://www.carislifesciences.com/about/news-and-media/caris-life-sciences-launches-codeai-real-world-clinico-genomic-data-platform-powered-by-artificial-intelligence/ (last accessed on May 9, 2023).

identical to (and after) Tempus, Caris has tried to leverage the data collected from its sequencing business to build a molecular and clinical data library.

105.    Today, Caris touts CODEai as the "most comprehensive, real-world data platform integrating Caris' extensive catalog of molecular data with cancer treatment information and clinical outcomes data for more than 390,000 patients covering greater than one million data points per patient."[9]

106.    Caris' library of data is marketed to life sciences companies to assist those companies in developing novel therapeutic treatments for cancer patients.   And like Tempus, the patients whose data was collected via sequencing tests can then be matched to potential treatments.

107.    Caris is not just one of many Tempus competitors in this specialized sector.  Unlike other healthcare technology companies, Tempus and Caris are two of the only companies in the world that overlap both as genomic sequencing laboratories and data licensing companies, which allows them to offer full integration of their data and sequencing product lines to their customers. For this reason, Caris is a "double competitor" of Tempus and is Tempus' main competitor.

108.    Industry roundtables and publications have routinely discussed Caris and Tempus in a joint manner, highlighting the competitive nature of the two companies.

109.    In one recent industry roundtable of oncologists, while discussing which tools physicians utilize in their practice, one oncologist remarked, "I would say, at the moment we're probably split evenly between Tempus and Caris Life Sciences."[10]

---

[9]    *See* Caris Products and Services, https://www.carislifesciences.com/products-and-services/artificial-intelligence/codeai/ (last accessed on May 9, 2023).

[10] *See* transcription of roundtable discussion titled Tumor-Normal Matched Sequencing and Platforms Utilized for Tumor Profiling discussed on July 22, 2021. Reproduced at: https://www.onclive.com/view/tumor-normal-matched-sequencing-and-platforms-utilized-for-tumor-profiling (last accessed on May 9, 2023).

110.    The language used on Caris' website even mirrors that of Tempus' website.[11]

111.    Effective May 1, 2023, Pawar accepted a role with Caris as its Vice President, Data Strategy and Solutions.

112.    Pawar's title is nearly identical to those he held with Tempus.

113.    Upon information and belief, Pawar will be helping Caris strategically improve and grow its data business. Pawar's new position with Caris, wherein he is "getting back into data," will inevitably require him to draw on his knowledge of Tempus' entire Data business. He will undoubtedly use Tempus' confidential information and trade secrets to improve Caris' CODEai and other data platforms to cut into Tempus' market share and better serve and market to Caris' customers and prospects. Through Pawar's knowledge, Caris will not have to endure the same trial and error as Tempus to create a more efficient and user-friendly product for its customers. Pawar will also inevitably leverage his knowledge of Tempus' products, tools, and services with respect to the Data business, Sequencing business, and Modeling Lab, as well as its customer base, to help increase Caris' industry presence and competitive edge.

---

[11] Compare Tempus' Website, https://www.tempus.com (last accessed May 9, 2023) ("We offer worldwide access to our comprehensive genomic profiling services and data-driven solutions to help inform patient care and advance precision oncology decisions"; "We deliver a broad range of sequencing services—tumor tissue and liquid DNA profiling, somatic and germline testing, tumor-normal matched profiling and RNA sequencing—all of which empowers you to make data-driven decisions for your patients"; and "We provide complimentary technology that allows providers safe and secure access to clinical reports and cutting-edge research applications. Powered by a rapidly growing library of clinical and genomic data, the Tempus platform is an easy and intuitive way to gain relevant insights by patient or by project") to Caris' Website https://www.carislifesciences.com (last accessed May 9, 2023) ("Our comprehensive molecular profiling approach precisely analyzes DNA, RNA, and protein biomarkers, revealing the highest quality molecular blueprint for evidence-based selection of the most appropriate cancer therapy. In addition to comprehensive molecular profiling, Caris has innovated industry-leading artificial intelligence algorithms that predict patient responses to standard treatments, such as immunotherapy or chemotherapy, based on their personalized molecular profile"; "The Caris molecular profiling comprehensive tumor profiling approach to assess DNA, RNA and Proteins reveals the highest quality molecular blueprint to guide more precise and individualized treatment decisions to improve outcomes"; and "Caris combines massive amounts of genomic, transcriptomic and proteomic data with clinical outcomes, creating one of the largest and most comprehensive databases of combined molecular and clinical outcomes data in the world . . . This convergence of data enables the identification of unique, novel signatures that has demonstrated improved outcomes and increased overall survival for cancer patients").

114.     Upon information and belief, and based on Pawar's statements to Tempus employees, Caris offered Pawar a $100,000 pay increase over his current Tempus salary (an offer which is well over-market in this industry).

115.     It will be impossible for Pawar to perform his role with Caris without utilizing the proprietary information and trade secrets relating to Tempus' business products, customers, processes, priorities, and strategies. Pawar's role at Caris will necessarily rely upon his extensive knowledge of Tempus' own evaluations of its products' strengths and weaknesses and its future plans. This knowledge goes beyond Tempus' Data business to include sensitive information about Tempus' other products, services, customers, and business plans.

116.     Tempus' trade secrets and confidential and proprietary information are at risk of disclosure because Pawar has used, and will continue to use, this information to create and promote competitive products and solutions. And, Pawar has already taken Tempus' information relating to Tempus' pricing and pricing guidelines, customer information, project proposals, and statements of work.

117.     Pawar has direct knowledge of Tempus' current offerings, future products, and planned innovations, as well as the processes and analyses behind those products and innovations. Pawar's role at Caris will undoubtedly require him to use this information to help Caris develop and refine its own competitive products, tools, and services and then market them to Tempus' clients and prospective clients. This will allow Caris to gain an unfair competitive advantage over Tempus.

118.     Tempus' business in this highly specialized space, including its competitive edge, innovative products, and relationships with its clients and other partners, remains at significant

risk due to Pawar's misappropriation of Tempus' trade secrets and future (and inevitable) threatened misappropriation of such trade secrets.

119.     Pawar's actions have damaged and will continue to damage Tempus, and they must be enjoined.

120.     Pawar's actions have diminished the value of Tempus' trade secrets and confidential and proprietary information and will no doubt harm Tempus' relationships with its customers.  This unfair competition will damage Tempus' goodwill, reputation, and competitive advantage.

## COUNT I
### Trade Secrets Misappropriation Under the Illinois Trade Secrets Act
### (Injunctive Relief and Damages)

121.     Tempus realleges and incorporates by reference Paragraphs 1 through 120 as though fully set forth herein.

122.     The Illinois Trade Secrets Act, 765 ILCS 1065/1 *et seq.*, prohibits the misappropriation of trade secrets.  Under the Act, a trade secret means "information, including but not limited to, a formula, pattern, compilation, program, device, method, technique, or process that: (1) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means, by others who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."

123.     Under the Act, misappropriation means any of the following: "(1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; (2) Disclosure or use of a trade secret of another without the express or implied consent by a person who: (a) Used improper means to acquire knowledge of the trade

secret; (b) At the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was: (1) Derived from or through a person who had utilized improper means to acquire it; (2) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; (3) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or (4) Acquired by accident or mistake."

124. Tempus dedicated substantial time and resources toward developing its Data business, including its data library and its proprietary software platform; maintaining and continually improving its Data business and each component of its Data business and product; customer lists, customer information including customer needs and preferences, and customer research and development targets and initiatives, pricing structures; prospective customer identities; new product roadmaps; business strategies and forecasting; the components of its Modeling Lab and the operations of the Modeling Lab; and other information that provides economic value to Tempus. This information gives Tempus an advantage over its competitors who have not compiled this information or expended the resources to develop these products and programs.

125. This information required substantial resources and time to develop, and it is not publicly known. It maintains its economic value due to its secrecy. At all relevant times, Tempus has made reasonable efforts to ensure that its confidential and proprietary trade secrets remain confidential, proprietary, secret, and available for Tempus' commercial use only. Tempus allows its employees access to this information only after they have executed confidentiality and non-competition agreements such as Pawar's CIPRA and CIPPAs.

126. Pawar had access to Tempus' confidential information and trade secrets in his roles leading the Data Partnership Program and managing the Alliance Management Team, wherein he

had access to all aspects of Tempus' Data business, all aspects of Tempus' data library and proprietary software platform, as well as Salesforce, which contains confidential information relating to all of Tempus' customers and prospective customers. Pawar also had knowledge of the operations of Tempus' Modeling Lab, including all aspects of various Statements of Work, new product development, and strategic forecasting for Tempus' business.

127. Pawar knew he had a duty to maintain the secrecy of Tempus' trade secrets due to his acknowledgement of such under the CIPRA and his two subsequent CIPPAs.

128. By virtue of his new position with Caris, a direct competitor of Tempus, and the significant overlap between his duties and responsibilities in his former position with Tempus and his new position with Caris, Pawar has threatened to misappropriate Tempus' trade secrets to compete unfairly with Tempus on behalf of Caris.

129. Pawar also physically took Tempus' trade secret information on April 20, 2023 when he printed copies of Tempus' documents containing its pricing and pricing guidelines, customer information, project proposals, and statements of work, among other things, which he still possesses. Pawar is now employed by Tempus' direct competitor and will use this information in his employment with Caris.

130. Upon information and belief, Caris has not taken any actions to prevent Pawar from using or disclosing Tempus' trade secrets, and any such actions would be ineffectual.

131. Caris has no doubt hired Pawar in order to benefit from and leverage his knowledge of Tempus' trade secret, proprietary, and confidential information.

132. In light of the similarities between Pawar's roles at Tempus and Caris and the fact that the companies are direct competitors in a highly specialized and niche industry, Pawar will

necessarily disclose or continue to disclose and utilize Tempus' trade secrets in the course of his employment with Caris in his role.

133.     Tempus has suffered and will continue to suffer damages and irreparable harm as a result of this misappropriation, including diminution of its trade secrets, harm to its reputation, goodwill, customer relationships, and its competitive advantage.

134.     Tempus has no adequate remedy at law for such present and future harm and therefore, is entitled to equitable relief in addition to compensatory relief.

135.     Pawar's actions will continue to cause irreparable harm and damages to Tempus if not enjoined.

136.     Because Pawar has committed the acts alleged herein willfully, in bad faith, from an improper motive amounting to malice, and in conscious disregard of Tempus' rights, Tempus is entitled to recover punitive damages from Pawar, in an amount according to proof at trial.

**WHEREFORE**, Tempus prays for judgment against Pawar and requests the Court grant the following relief:

A.  Entry of a Temporary Restraining Order against Pawar consistent with the relief as requested in Plaintiff's Motion for a Temporary Restraining Order and Memorandum in Support;

B.  Entry of a Preliminary Injunction, and, upon final disposition, entry of a Permanent Injunction against Pawar enjoining him from disclosing or using Tempus' confidential, proprietary and trade secret information, and any other applicable relief as set forth in Plaintiff's Motion for a Temporary Restraining Order and Memorandum in Support;

C.  Entry of a Preliminary Injunction, and, upon final disposition, entry of a Permanent Injunction against Pawar enjoining him from working for Caris in a role similar to that in which he served Tempus;

D.  For actual, compensatory, and exemplary damages to be determined at trial; and

E.  Such other and further relief the court deems just.

<u>**COUNT II**</u>
**Trade Secrets Misappropriation Under the Defend Trade Secrets Act**
**(Injunctive Relief and Damages)**

137.  Tempus realleges and incorporates by reference Paragraphs 1 through 136 as though fully set forth herein.

138.  The Defend Trade Secrets Act ("DTSA") of 2016, Pub. L. No. 114-153, 130 Stat. 376, which was passed into law on May 11, 2016 and amends chapter 90 of Title 18 of the U.S. Code, forbids threatened and actual misappropriation of trade secrets "if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1).

139.  Under the DTSA, "trade secret" means "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if, (A) the owner thereof has taken reasonable measures to keep such information secret, and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information."  18 U.S.C. § 1839(3).

140.    Under the DTSA, "misappropriation" means "(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (B) disclosure or use of a trade secret of another without express or implied consent by a person who: (i) used improper means to acquire knowledge of the trade secret; or (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was: (I) derived from or through a person who had used improper means to acquire the trade secret; (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or (iii) before a material change of the position of the person, knew or had reason to know that (I) the trade secret was a trade secret and (II) knowledge of the trade secret had been acquired by accident or mistake."  18 U.S.C. § 1839(5).

141.    Under the DTSA, "improper means" "(A) includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means; and (B) does not include reverse engineering, independent derivation, or any other lawful means of acquisition."  18 U.S.C. § 1839(6).

142.    Tempus dedicated substantial time and resources toward developing its Data business, including its data library and its proprietary software platform; maintaining and continually improving its Data business and each component of its Data business and product; customer lists, customer information including customer needs and preferences, customer research and development targets and initiatives, and pricing structures; prospective customer identities; new product roadmaps; business strategies and forecasting; the components of its Modeling Lab and the operations of the Modeling Lab; and other information that provides economic value to

Tempus. This information gives Tempus an advantage over its competitors who have not compiled this information or expended the resources to develop these products and programs.

143.    This information required substantial resources and time to develop, and it is not publicly known. It maintains its economic value due to its secrecy. At all relevant times, Tempus has made reasonable efforts to ensure that its confidential and proprietary trade secrets remain confidential, proprietary, secret, and available for Tempus' commercial use only. Tempus allows its employees access to this information only after they have executed confidentiality and non-competition agreements such as Pawar's CIPRA and CIPPAs.

144.    Pawar had access to Tempus' confidential information and trade secrets in his roles leading the Data Partnership Program and managing the Alliance Management Team, wherein he had access to all aspects of Tempus' Data business, all aspects of Tempus' data library and proprietary software platform as well as Salesforce, which contained confidential information relating to all of Tempus' customers and prospective customers. Pawar also had knowledge of the operations of Tempus' Modeling Lab, including all aspects of various Statements of Work, new product development, and strategic forecasting for Tempus' business.

145.    Pawar knew he had a duty to maintain the secrecy of Tempus' trade secrets due to his acknowledgement of such under the CIPRA and his two subsequent CIPPAs.

146.    By virtue of his new position with Caris, a direct competitor of Tempus, and the significant overlap between his duties and responsibilities in his former position with Tempus and his new position with Caris, Pawar has threatened to misappropriate Tempus' trade secrets to compete unfairly with Tempus on behalf of Caris.

147.    Pawar also physically took Tempus' trade secret information on April 20, 2023 when he printed copies of Tempus' documents containing its pricing and pricing guidelines,

customer information, project proposals, and statements of work, among other things, which he still possesses. Pawar is now employed by Tempus' direct competitor and will use this information in his employment with Caris.

148. Upon information and belief, Caris has not taken any actions to prevent Pawar from using or disclosing Tempus' trade secrets, and any such actions would be ineffectual.

149. Caris has no doubt hired Pawar in order to benefit from and leverage his knowledge of Tempus' trade secret, proprietary, and confidential information.

150. In light of the similarities between Pawar's roles at Tempus and Caris and the fact that the companies are direct competitors, Pawar will necessarily disclose or continue to disclose and utilize Tempus' trade secrets in the course of his employment with Caris in his role.

151. Pawar's actions constitute actual misappropriation and threatened misappropriation in violation of the Defend Trade Secrets Act.

152. Tempus has suffered and will continue to suffer damages and irreparable harm as a result of this misappropriation, including diminution of its trade secrets, harm to its reputation, goodwill, customer relationships, and its competitive advantage.

153. Tempus has no adequate remedy at law for such present and future harm and therefore, is entitled to equitable relief in addition to compensatory relief.

154. Pawar's actions will continue to cause irreparable harm and damages to Tempus if not enjoined.

155. Because Pawar has committed the acts alleged herein willfully, in bad faith, from an improper motive amounting to malice, and in conscious disregard of Tempus' rights, Tempus is entitled to recover punitive damages from Pawar, in an amount according to proof at trial.

**WHEREFORE**, Tempus prays for judgment against Pawar and requests the Court grant the following relief:

A.  Entry of a Temporary Restraining Order against Pawar consistent with the relief as requested in Plaintiff's Motion for a Temporary Restraining Order and Memorandum in Support;

B.  Entry of a Preliminary Injunction, and, upon final disposition, entry of a Permanent Injunction against Pawar enjoining him from disclosing or using Tempus' confidential, proprietary and trade secret information, and any other applicable relief as set forth in Plaintiff's Motion for a Temporary Restraining Order and Memorandum in Support;

C.  Entry of a Preliminary Injunction, and, upon final disposition, entry of a Permanent Injunction against Pawar enjoining him from working for Caris in a role similar to that in which he served Tempus;

D.  For actual, compensatory, and exemplary damages to be determined at trial; and

E.  Such other and further relief the court deems just.

## COUNT III
### Breach of Duty of Loyalty
### (Damages)

156.  Tempus realleges and incorporates by reference Paragraphs 1 through 155 as though fully set forth herein.

157.  As its employee, Pawar owed Tempus a duty of loyalty.

158.  This required Pawar to act solely in the interest of Tempus.

159.     On April 20, the day before he resigned from Tempus, Pawar violated his duty of loyalty to Tempus when he printed copies of Tempus' confidential and trade secret information for improper and unlawful use at his new employer, Caris.

160.     Such actions benefit Pawar and his new employer, Caris, Tempus' direct competitor, at Tempus' direct expense.

161.     Pawar further breached his duty of loyalty to Tempus on April 5 and 6, 2023 when he fraudulently misrepresented that he needed a new CIPPA for purposes of applying for permanent residency card.

162.     Pawar made false statements to Tempus, his then-employer, in order to benefit himself at Tempus' expense.

163.     Pawar's actions have damaged Tempus in an amount to be determined at trial.

**WHEREFORE**, Tempus prays for judgment against Pawar and requests the Court grant the following relief:

    A.   For actual, compensatory, and exemplary damages to be determined at trial; and

    B.   Such other and further relief the court deems just.

<u>**COUNT IV**</u>
**Fraudulent Inducement/Misrepresentation**
**(Damages)**

164.     Tempus realleges and incorporates by reference Paragraphs 1 through 163 as though fully set forth herein.

165.     Pawar made a false statement of material fact to Tempus when he falsely represented he needed a new CIPPA pursuant to a request from the USCIS and in relation to his permanent residency application.

166.     Pawar knew this statement was false and that the USCIS never made any such request.

167.     Pawar intended for Tempus to rely on this false statement to induce Tempus to issue him a new CIPPA without any post-employment restrictive covenants relating to non-competition.

168.     Based on its relationship with Pawar and its trust in him, Tempus relied on the truth of Pawar's representations regarding the USCIS' request and the need to issue Pawar a new CIPPA.

169.     Tempus did in fact issue Pawar the CA CIPPA pursuant to his request and false statements and representations.  The CA CIPPA did not contain any post-employment restrictive covenants relating to non-competition.

170.     As a result, Pawar joined Tempus' competitor, Caris, in a similar role to the ones he held at Tempus.

171.     Pawar's actions put Tempus' confidential, proprietary and trade secret information at great risk of improper use and disclosure.

172.     Tempus' confidential, proprietary and trade secret information will be used to unfairly compete with Tempus at Pawar's and Caris' benefit.

173.     Pawar's actions have and will result in diminution of the value of Tempus' confidential, proprietary and trade secret information.

**WHEREFORE**, Tempus prays for judgment against Pawar and requests the Court grant the following relief:

A.  For actual, compensatory, and exemplary damages to be determined at trial; and

B.  Such other and further relief the court deems just.

## PRAYER FOR RELIEF

With respect to this Verified Complaint, and based on the foregoing, Plaintiff Tempus Labs, Inc. prays for the following relief:

1. Entry of a Temporary Restraining Order against Pawar enjoining him from using or disclosing Tempus' trade secrets and proprietary and confidential information;

2. For actual, compensatory, punitive and exemplary damages to be determined at trial; and

3. Such other and further relief the court deems just, including all fees and costs associated with this action.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff Tempus Labs, Inc. hereby asserts its right to a trial by jury on all counts so triable.


Dated: May 10, 2023                     Respectfully submitted,

                                        By: */s/ Kevin M. Cloutier*

                                        Kevin M. Cloutier (6273805)
                                        Mikela T. Sutrina (6311408)
                                        David M. Poell (6302765)
                                        **SHEPPARD MULLIN RICHTER & HAMPTON LLP**
                                        321 N. Clark Street, 32nd Floor
                                        Chicago, Illinois 60654
                                        Tel: (312) 499-6300
                                        Fax: (313) 499-6301
                                        kcloutier@sheppardmullin.com
                                        msutrina@sheppardmullin.com
                                        dpoell@sheppardmullin.com
                                        *Attorneys for Tempus Labs, Inc.*

## <u>VERIFICATION</u>

I, Lee Black, am the Senior Vice President & General Manager of Data for Tempus Labs, Inc. and am authorized to make this verification for and on Plaintiff's behalf. I declare that I have read the Verified Complaint and know the contents thereof. The matters and things set forth therein are true to the best of my knowledge, except as to those matters set forth upon information and belief and, as to those, I believe them to be true; however, in compiling this information, information has been supplied by others, and I am relying in part upon their representations.

I declare under penalty of perjury that the aforesaid is true and correct.

Executed on May 10, 2023

DocuSigned by:

*lee Black*

EF0A6995547D440...
_____
Lee Black
Senior Vice President & General Manager of Data
Tempus Labs, Inc.

**DocuSign**

## Certificate Of Completion

Envelope Id: BF9A0A3B3DE1464A94208F49E0A8A66E
Subject: 'Tempus v. Pawar - L. Black Complaint Verification' for signature
Source Envelope:
Document Pages: 1
Certificate Pages: 4
AutoNav: Enabled
EnvelopeId Stamping: Disabled
Time Zone: (UTC-08:00) Pacific Time (US & Canada)

Signatures: 1
Initials: 0

Status: Completed

Envelope Originator:
Mikela Sutrina
333 South Hope Street, 43rd Floor
Los Angeles, CA 90071
msutrina@sheppardmullin.com
IP Address: 44.235.189.109

## Record Tracking

Status: Original
    5/10/2023 4:57:56 AM

Holder: Mikela Sutrina
    msutrina@sheppardmullin.com

Location: DocuSign

## Signer Events

| Signer Events | Signature | Timestamp |
|---|---|---|
| Lee Black<br>lee.black@tempus.com<br>Security Level: Email, Account Authentication<br>(None) | *DocuSigned by:*<br>*Lee Black*<br>EF0A6995547D440...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 4.4.34.242 | Sent: 5/10/2023 4:58:25 AM<br>Viewed: 5/10/2023 5:31:39 AM<br>Signed: 5/10/2023 5:31:46 AM |

Electronic Record and Signature Disclosure:
    Accepted: 5/10/2023 5:31:39 AM
    ID: dd3104fc-a0b9-4270-9778-5736dd07ba36

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 5/10/2023 4:58:25 AM |
| Certified Delivered | Security Checked | 5/10/2023 5:31:39 AM |
| Signing Complete | Security Checked | 5/10/2023 5:31:46 AM |
| Completed | Security Checked | 5/10/2023 5:31:46 AM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**