## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| TEMPUS LABS, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 23-cv-2947 |
| | ) | |
| SANDEEP PAWAR, an individual, | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF TEMPUS LABS, INC.'S MEMORANDUM OF LAW IN SUPPORT OF EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER

Kevin M. Cloutier (ARDC # 6273805)
Mikela T. Sutrina (ARDC # 6311408)
David M. Poell (ARDC # 6302765)
**SHEPPARD MULLIN RICHTER & HAMPTON LLP**
321 North Clark Street, 32nd Floor
Chicago, IL 60654
Tel: (312) 499-6300
Fax: (312) 499-6301
kcloutier@sheppardmullin.com
msutrina@sheppardmullin.com
dpoell@sheppardmullin.com

*Counsel for Plaintiff Tempus Labs, Inc.*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................................1

RELEVANT FACTUAL BACKGROUND ........................................................................3

I.      Tempus' Business ........................................................................................................3

II.     Pawar's Role and Duties at Tempus ....................................................................5

III.    Pawar's Agreements with Tempus ........................................................................7

IV.    Pawar's Resignation and Pre-Resignation Activities ......................................9

V.     Tempus and Caris Are Direct Competitors........................................................11

ARGUMENT ......................................................................................................................12

I.      The Governing Legal Standard Warrants Issuance of a TRO .........................12

II.     Tempus Is Likely to Succeed on the Merits of Its Threatened Trade Secret
Misappropriation Claims Under Illinois and Federal Law ...............................12

      A.     Tempus' Customer Information, Strategies, Plans, and Initiatives for Its
Data Licensing Business and Biologic Modeling Lab Constitute Trade
Secrets ......................................................................................................13

              i.      Tempus' Data Library and Proprietary Software are Trade Secrets..........14

              ii.     Tempus' Customer Information Constitutes Trade Secrets......................16

              iii.    Pawar Had Direct Access to Tempus' Business Plans and
Operational Capabilities.............................................................................17

              iv.    Tempus Invests in and Protects Its Trade Secrets.....................................19

      B.     The Evidence Strongly Indicates Pawar Will Disclose and Use Tempus'
Trade Secrets In His Substantially Similar Role for Tempus' Main
Competitor ................................................................................................21

              i.      Caris is Tempus' Direct Competitor...........................................................22

              ii.     Pawar's Role at Caris Mirrors His Former Roles at Tempus ...................23

              iii.    Caris Has Not Taken Any Measures to Protect Tempus' Trade
Secrets ......................................................................................................24

              iv.    Pawar Will Inevitably Disclose Tempus' Trade Secrets to Caris.............25

              v.     Pawar Engaged in Improper and Concerning Pre-Resignation
Conduct.....................................................................................................28

III.    Tempus Will Suffer Irreparable Harm in the Absence of a TRO .....................29

IV.    The Balance of Hardships Strongly Favors Tempus and The Issuance of a TRO
Will Not Disserve the Public Interest ...................................................................31

CONCLUSION....................................................................................................................33

# **TABLE OF AUTHORITIES**

**Page(s)**

## **Cases**

*Allied Waste Servs. Of N. Am., LLC v. Tibble*
  177 F. Supp. 3d 1103 (N.D. Ill. 2016) ................................................................13

*Aon PLC v. Infinite Equity, Inc.*
  2021 WL 4192072 (N.D. Ill. Sept. 15, 2021) .............................................. passim

*APC Filtration, Inc. v. Becker*
  646 F. Supp. 2d 1000 (N.D. Ill. 2009) ................................................................17

*Brown & Brown, Inc. v. Ali*
  592 F. Supp. 1009 (N.D. Ill. 2009) .....................................................................32

*Brunswick Corp. v. Jones*
  784 F.2d 271 (7th Cir. 1986) ..............................................................................32

*Complete Bus. Sols., Inc. v. Mauro*
  2001 WL 290196 (N.D. Ill. Mar. 16, 2001)........................................................22

*Diamond Blade Warehouse, Inc. v. Paramount Diamond Tools, Inc.*
  420 F. Supp. 2d 866 (N.D. Ill. 2006) ..................................................................30

*E*TRADE Fin. Corp. v. Pospisil*
  2018 WL 4205401 (N.D. Ill. Sept. 4, 2018) .......................................................30

*Fire 'Em Up, Inc. v. Technocarb Equip. (2004) Ltd.*
  799 F. Supp. 2d 846 (N.D. Ill. 2011) ..................................................................15

*Groupon, Inc. v. Shin*
  No. 21-cv-6082, 2022 WL 60526 (N.D. Ill. Jan. 6, 2022)............................. passim

*HCA Franchise Corp. v. Alisch*
  2016 WL 10706285 (N.D. Ind. Aug. 12, 2016)...................................................30

*Hess Newmark Owens Wolf, Inc. v. Owens*
  415 F.3d 630 (7th Cir. 2005) ..............................................................................30

*Inmar, Inc. v. Vargas*
  No. 18-cv-2306, 2018 WL 6716701 (N.D. Ill. Dec. 21, 2018)........................18, 20

*Lakeview Tech., Inc. v. Robinson*
  446 F.3d 655 (7th Cir. 2006) ........................................................................2, 29, 32

*Liebert Corp. v. Mazur*
  357 Ill. App. 3d 265, 284 (1st Dist. 2005) ....................................................24, 29

*Life Spine, Inc. v. Aegis Spine, Inc.*
8 F.4th 531 (7th Cir. 2021) ...................................................................30, 31

*Long v. Bd. Of Educ.*
167 F. Supp. 2d 988 (N.D. Ill. 2001) ...................................................12

*Lucini Italia Co. v. Grappolini*
2003 WL 1989605 (N.D. Ill. April 28, 2003) ......................................32

*Mickey's Linen v. Fischer*
2017 WL 3970593 (N.D. Ill. Sept. 8, 2017) ................................. passim

*Molon Motor & Coil Corp. v. Nidec Motor Corp.*
2017 WL 1954531 (N.D. Ill. May 11, 2017) ........................................22

*NAV Consulting, Inc. v. Kumawat*
No. 1:22-CV-03624, Mem. Op. & Order..............................18, 22, 27

*Packaging Corp. of Am., Inc. v. Croner*
419 F. Supp. 3d 1059 (N.D. Ill. 2020) .................................................22

*PepsiCo. v. Redmond*
1996 WL 3965 (N.D. Ill. Jan. 2, 1996).........................................23, 27

*PepsiCo, Inc. v. Redmond*
54 F.3d 1262 (7th Cir. 1995) ........................................................ passim

*RKI, Inc. v. Grimes*
177 F. Supp. 2d 859 (N.D. Ill. 2001)......................................20, 21, 29

*Strata Mktg., Inc. v. Murphy*
317 Ill. App. 3d 1054 (1st Dist. 2000) ....................................21, 22, 24

*Vendavo, Inc. v. Long*
397 F. Supp. 3d 1115 (N.D. Ill. 2019) ....................................17, 21, 27

*W. Capra Consulting Grp., Inc. v. Snyder*
2019 WL 3935045 (N.D. Ill. Aug. 20, 2019) ......................................31

*Walgreens Co. v. Peters*
2021 WL 3187726 (N.D. Ill. July 28, 2021)........................................16

*Winter v. Nat. Res. Def. Council, Inc.*
555 U.S. 7 (2008)...............................................................................29, 30

## Statutes

765 ILCS 1065/2(d) ...........................................................................13

765 ILCS 1065/3(a) ...................................................................................13

18 U.S.C. § 1836(b)(1) ..............................................................................13

18 U.S.C. § 1836(b)(3) ..............................................................................13

18 U.S.C. § 1893(3) ...................................................................................14

Defend Trade Secrets Act, 18 U.S.C. § 1831 .................................... passim

Illinois Trade Secrets Act............................................................... passim

## **Other Authorities**

Federal Rules of Civil Procedure Rule 65 ....................................................1

Oliver Wendell Holmes, Jr., The Common Law 1 (1881)..........................27

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, Plaintiff Tempus Labs, Inc. respectfully moves for a temporary restraining order enjoining Defendant Sandeep Pawar from using or disclosing Tempus' trade secrets in contravention of the Illinois Trade Secrets Act and the federal Defend Trade Secrets Act.

## PRELIMINARY STATEMENT

This action arises out of a disturbing pattern of deceit perpetrated by a former high-level Tempus employee—Pawar—on the eve of his sudden resignation. Tempus is a cutting-edge healthcare technology company that has spent countless hours and resources developing a portfolio of tools that transform healthcare data into actionable insights for physicians, academic researchers, and life sciences companies. In the eight years since its founding, Tempus has raised more than $1 billion and revolutionized medical care by combining next-generation genomic sequencing, real-world data, and artificial intelligence to drive innovations in precision medicine. And for almost half of Tempus' existence, Pawar served in several leadership positions overseeing the development and innovation of Tempus' highly specialized and niche data-product offerings. By virtue of his position and long tenure with Tempus, Pawar has intimate knowledge of Tempus' trade secrets.

But now Pawar has decided to use his knowledge to damage Tempus' competitive standing in a nearly identical role for Tempus' competitor: Caris Life Sciences. Lacking an adequate remedy at law and seeking to prevent any irreparable harm immediately, Tempus has no choice but to request an emergency injunction to prevent Pawar from employment with Caris and from disclosing Tempus' trade secrets.

Tempus is entitled to a temporary restraining order pursuant to the inevitable disclosure doctrine. While Pawar may not be subject to a non-compete restriction, that does not diminish Tempus' clear right to injunctive relief.

-1-

Last month, Pawar misled Tempus into agreeing to a new employment agreement that lacked a non-compete covenant. Specifically, Pawar falsely represented his need for a new agreement purportedly based on a request by the United States Citizenship and Immigration Services ("USCIS") related to his application for permanent residency. In reality, Pawar's representations were lies designed to obtain a new agreement devoid of restrictive covenants so he could freely join Caris. Pawar must have thought that the absence of a noncompete (to which he had previously agreed) posed no problem for his contemplated future employment at Caris because his subsequent actions further revealed a cavalier attitude toward his contractual obligations to Tempus. After deceiving Tempus into entering into a new employment agreement, Pawar printed numerous confidential company documents *the day before his resignation* so he could no doubt use the information for Caris' benefit (and to Tempus' detriment) in his new position.

Pawar badly miscalculated. It is settled in this Circuit that "[i]njunctions issue to curtail palpable risks of future injury; *it is not essential to establish that the worst has come to pass*." *Lakeview Tech., Inc. v. Robinson*, 446 F.3d 655, 657 (7th Cir. 2006) (emphasis added). Here, even on a limited evidentiary record, the facts show that Pawar's actions present a clear and present danger that he will misappropriate and disclose Tempus' trade secrets to Caris. All the factors Illinois courts consider in determining whether to grant an injunction on inevitable disclosure grounds are present on this preliminary record. It is undisputed that Tempus and Caris are competitors. Pawar's new role as Caris' Vice President, Data Strategy and Solutions is similar, if not identical, to roles he has held at Tempus. And there are no measures Pawar or Caris could take to prevent them from relying on Pawar's vast and detailed knowledge of the inner-workings of Tempus' business operations and customer-specific preferences.

This Court should exercise its equitable powers to stop this nefarious plan in its tracks, lest Tempus be damaged by a former employee who seems to think the rules do not apply to him. Illinois law and federal law prohibit his sly maneuvers. Pawar's disregard for the legal obligations he owes to Tempus show that he is simply not to be trusted in a position where the temptation to use and disclose Tempus' trade secrets to further his professional endeavors is far too great to overcome. By his own conduct, Pawar has shown that his duty of loyalty to Tempus means nothing to him. The Court should order injunctive relief with dispatch.

## RELEVANT FACTUAL BACKGROUND

### I.     Tempus' Business

Tempus is a healthcare technology company based in Chicago, Illinois. (Verified Complaint ("Ver. Compl.") ¶ 19.) Tempus combines next generation sequencing, real-world data, technology, and artificial intelligence to provide actionable insights for physicians, academic researchers, and life sciences companies. (*Id*. ¶¶ 18, 20.) While Tempus' business is multifaceted, the two largest components of its business are its Genomic Sequencing and Data businesses. (*Id*. ¶ 19.)

Tempus' Sequencing business focuses on genomic sequencing testing and related genetic testing operations. (*Id*.) As part of this business, Tempus analyzes patients' DNA and RNA data to identify potential treatments based on the patients' unique genomic makeup, primarily for late stage cancer patients. (*Id*. ¶ 20.) Tempus' tests are used for both clinical and research purposes, and the data generated through the tests feed into Tempus' data library. (*Id*.)

Under its Data business, Tempus collects and maintains de-identified, multi-modal datasets through its Sequencing business, healthcare providers, and other sources. (*Id*. ¶ 21.) Tempus has built a proprietary technology platform that aggregates, abstracts, structures, and de-identifies the data to facilitate the deployment of artificial intelligence at scale. (*Id*.) Tempus has amassed what

-3-

it believes is the largest de-identified database of clinical and molecular data of cancer patients in the world. (*Id.* ¶ 23.) Through its Data business, Tempus licenses this de-identified data to life sciences companies to assist in the pursuit of treatments and trials, and to drive innovations in precision medicine. (*Id.* ¶ 25.) These companies use Tempus' datasets and proprietary technology to discover previously undiscoverable trends, identify clinical patterns, and characterize genetic mutations and diseases on a molecular level. (*Id.*)

The complete integration of Tempus' Data and Sequencing businesses has allowed the company to establish itself in the niche and highly competitive Genomic Sequencing and Healthcare Data & Artificial Intelligence industry. (*Id.* ¶ 27.) Tempus is one of only a few companies that uses its own library of molecular and clinical data to power precision medicine research while also operating its own large-scale genomic sequencing laboratory. (*Id.* ¶ 30.) Given the relatively small number of companies that operate in this nascent industry, competition is fierce. (*Id.* ¶ 31.) Tempus has worked to gain a competitive edge over its competition through massive investment, its extensive and targeted training of its employees, its strategic and thorough monitoring and planning of operations, its commitment to and development of customer relationships and understanding customer goals and needs, its ongoing and continuing development of cutting-edge technology, and its continuous ability to master the way data plays a role in improving patient outcomes. (*Id.*) Tempus has also taken strides to provide its customers a more usable data library format in which customers can more easily leverage the information in the data library. (*Id.* ¶ 32.)

To protect its confidential information and trade secrets ingrained in every facet of Tempus' business, including its Sequencing and Data businesses, Tempus utilizes multiple security measures including, among other things, password-protecting its systems, requiring

double-authentication, monitoring activity on its databases, and requiring employees agree to and re-affirm their commitment to confidentiality. (*Id*. ¶ 37.)

## II.      Pawar's Role and Duties at Tempus

Tempus hired Pawar in the Fall of 2019 as its Director, Strategic Operations, located in Chicago, Illinois. (*Id*. ¶ 39.) In his role as Director, Strategic Operations, Pawar led Tempus' Data Partnerships Program. (*Id*. ¶ 40.) Pawar worked directly with Tempus' core data partners and internal and external stakeholders to become intimately familiar with their business, services, needs, and asks so that Tempus met all of their objectives. (*Id*.) Pawar also extensively engaged with industry partners to understand their research needs so that he could develop project specifications, define trial cohorts, and actively manage project execution. (*Id*.) Tempus tasked Pawar with working with its cross-functional teams to thoroughly understand and support the end-to-end process from data receipt to potential export, including suggesting ways to improve Tempus' proprietary Data Model so that its customers could derive value and insight from Tempus data. (*Id*. at 41.) His role also required him to lead multiple teams and projects focused on delivering health economics and outcome analyses to Tempus' research partners. (*Id*.) Pawar gained intimate knowledge of Tempus' clinical and molecular data, which he used to determine key outcomes for Tempus' customers. (*Id*.)

In or around October 2020, Tempus moved Pawar into a new role as Director, Alliance Management. (*Id*. ¶ 42.) The responsibilities in this role built on his previous role. (*Id*.) In this role, Pawar managed Tempus' Alliance Management Team. (*Id*. ¶ 43.) Tempus trained Pawar and his team extensively on the full suite of Tempus' data offerings and proprietary platforms so that they could teach this information to Tempus' customers. (*Id*. ¶¶ 45-46.) Pawar led eight direct reports in Tempus' efforts to, among other things, onboard customers to Tempus' data platform, identify each customer's unique and specialized research needs, train Tempus' customer

team to effectively use Tempus' data library, and intimately work with customers to navigate Tempus' data library.  (*Id.* ¶ 44.)

This was a key position at Tempus – Pawar was literally charged with ensuring the success of Tempus' Data business customers, which required him to access confidential information relating to Tempus' customers and prospective customers, including Tempus' largest most highest revenue producing customers.  (*Id.* ¶¶ 43, 47.)  Pawar understood Tempus' customers' problems, needs, wants, pain points, and research targets on the most detailed level.  (*Id.* ¶ 47.)  Through this role (and others) with Tempus, and the extensive training Tempus provided him, Pawar understood: (1) how to collect healthcare data from various sources; (2) what data is important and necessary (and what is not); (3) how to extract the important data from petabytes of insignificant data; (4) how Tempus abstracted, structured, and de-identified the data for customer use; and (5) how to communicate with and train customers to use this data effectively.  (*Id.* ¶ 50.)  Pawar also had detailed access to and information about (1) Tempus' existing proprietary products; (2) Tempus' product development roadmap, which was created in response to detailed market feedback from Tempus' customers; and (3) detailed customer information contained in Tempus' customer relationship management platform, Salesforce.  (*Id.* ¶ 53.)

On or around July 9, 2021, Tempus changed Pawar's title to its Head, Data Product Strategy.  (*Id.* ¶ 55.)  Around the same time, Pawar relocated to California.  (*Id.* ¶ 56.)  And then, on or around October 18, 2021, Tempus moved Pawar into a role as its Head, Data Growth & Operations Strategy.  (*Id.* ¶ 55.)  In these roles, Pawar focused on data growth and strategy.  (*Id.* ¶ 60.)  Pawar still managed the Alliance Management Team, but he was also responsible for "long-range planning and [Tempus'] data product roadmap to grow and improve Tempus' data and AI offerings."  (*Id.* ¶ 59.)  He was also responsible for the "assessment, design, and tactical execution

of multi-quarter initiatives." (*Id*.) Pawar continued to have access to Tempus' customer information, prospective customer information, and the Data business. (*Id*. ¶ 63.) In his own words, Pawar worked with and had knowledge of "data growth," "customer success," and "data provisioning functions." (*Id*. ¶ 61.)

On or around February 24, 2022, Tempus promoted Pawar, this time to the role of Senior Director, Data Growth & Operations Strategy. (*Id*. ¶ 64.) In this role, Pawar managed Tempus' Modeling Lab's Project Managers. (*Id*.) Through the Modeling Lab, one of only a few of its kind, Tempus grows and reproduces 3D cancer tissue called "organoids" for use in targeted drug screenings, for example to test the efficacy or toxicity of a drug and other research and development projects. (*Id*. ¶ 28.) The Modeling Lab produces research and data that is used in Tempus' Data business, as well as for targeted drug screening, research, and development. (*Id*. ¶ 65.)

As the Senior Director, Data Growth & Operations Strategy, Pawar had access to all of the Modeling Lab's operations. (*Id*. ¶ 67.) In addition to oversight of all the Modeling Lab's projects, Pawar had intimate knowledge of the equipment used in the Modeling Lab, and he approved all Statements of Work for each customer. (*Id*.) This gave Pawar intimate insight into customers' ongoing research and development targets, their specific needs, and forecasting of various customer initiatives. (*Id*.)

### III.  **Pawar's Agreements with Tempus**

Throughout his time at Tempus, Pawar entered into various agreements to protect Tempus' trade secrets, proprietary and confidential information, and customer and employee relationships. (*Id*. ¶ 70.) In August 2019, in connection with Tempus' offer of employment to Pawar, Pawar executed a Confidentiality, Intellectual Property and Restrictive Covenants Agreement (the "CIPRA"). (*Id*. ¶ 71.) As part of the CIPRA, Pawar agreed to certain protective covenants,

including confidentiality, proprietary information, and non-competition provisions. (*Id*. ¶¶ 74-75.) In exchange for executing the CIPRA, Tempus provided Pawar continued employment, a base salary of $165,000, and 3,000 restricted stock units ("RSUs"). (*Id*. ¶ 73.)

In February 2021, Tempus presented Pawar with a Confidentiality, Intellectual Property, and Protective Covenants Agreement (the "CIPPA") in connection with a salary increase. (*Id*. ¶ 78.) This CIPPA superseded the CIPRA. (*Id*.) Pawar executed the CIPPA in connection with his salary adjustment, and he, again, agreed to certain protective covenants, including confidentiality, proprietary information, and non-competition provisions. (*Id*. ¶¶ 78-80.)

On April 1, 2023, Pawar messaged Tempus' immigration attorney that he had recently been approved for a Green Card pending his response to a question from the United States Citizenship and Immigration Services ("USCIS"). (*Id*. ¶¶ 84-85.) He notified the immigration attorney that, due to a Request for Evidence ("RFE") from the USCIS, he needed an amended employment agreement that showed he resided in California, and which was otherwise compliant with California law. (*Id*. ¶ 85.) Although the immigration attorney requested Pawar send to him a copy of the RFE, Pawar did not. (*Id*. ¶ 86.) Instead, Pawar took his request directly to Tempus' People Team. (*Id*.)

Pawar represented to Tempus' People Team that he needed a revised employment agreement compliant with California law due to a request from the USCIS. (*Id*. ¶ 87.) At first, the People Team declined Pawar's request because Tempus typically only updates employment agreement's during a compensation cycle, and when an employee receives some type of consideration in return. (*Id*. ¶ 90.) However, Pawar persisted, and based on Pawar's representations regarding his Green Card status, and the trust between Tempus and Pawar, Tempus provided Pawar with a CIPPA governed by California law (the "CA CIPPA") on April 6, 2023.

(*Id*.)  The CA CIPPA, of course, did not include a non-competition provision.  (*Id*. ¶ 91.)  The very same day, Pawar asked the People Team if "the revised California CIPRA" "supersedes the original one."  (*Id*.)  Tempus confirmed it did.  (*Id*.)  Pawar executed the CA CIPPA.  (*Id*. ¶ 90.)  In doing so, he acknowledged the terms of the CA CIPPA were reasonable.  (*Id*.)

In executing the CA CIPPA, Pawar agreed to certain confidentiality obligations.  (*Id*. ¶ 92.)  In pertinent part, the confidentiality provisions of the CA CIPPA provide:

> a. C*onfidential and Proprietary Information.* Your job requires you to be exposed to [confidential and proprietary information ("CPI")] of Tempus, its subsidiaries, and other third parties, including technical and commercial information related to Tempus, its customers', or its prospective customers' business that is not generally known to the public. CPI includes, among other things, all patent, trade secret, design, copyright, trademark, and other intellectual and tangible property rights in all Innovations. CPI also includes proprietary or confidential information of any other third party who may disclose such information to Tempus or to you under any obligation of confidentiality in the course of Tempus' business, including protected health information and personal data protected by applicable law. CPI is valuable to Tempus and the core of our business. Employees who will be exposed to CPI must sign an agreement before joining our team to protect CPI.
>
> b. *Ownership of and Obligations Regarding Innovations.*
>
>     . . .
>
> v. You agree to keep all CPI that you encounter in strict confidence, even after you leave Tempus. You cannot use CPI for your own purposes, you cannot take CPI with you if you leave (in fact, you are required to give it back or destroy it), and you cannot disclose CPI to any third party unless required to do so as part of your job at Tempus, or because of a legitimate law enforcement demand.

(*Id*.)

## IV.    Pawar's Resignation and Pre-Resignation Activities

Just a few weeks after executing the CA CIPPA, on April 21, 2023, Pawar tendered his notice of resignation to Tempus.  (*Id*. ¶ 95.)  This same day was Pawar's last day of employment with Tempus.  (*Id*.)  Pawar told Tempus he was considering an offer from Caris Life Sciences ("Caris"), one of Tempus' direct competitors, that would "get him back into data."  (*Id*. ¶ 96.)

Effective May 1, 2023, Pawar accepted a role with Caris as its Vice President, Data Strategy and Solutions. (*Id*. ¶ 111.)

On April 20, the day before he resigned and his last day of employment at Tempus, Pawar printed a number of highly confidential Tempus documents, including, but not limited to:

    a.  Tempus' 2023 Data Product Pricing Guide, which contains Tempus' specific pricing information and guidelines as well as team feedback and plans to further build out Tempus' pricing structure, plans, and guidelines;

    b.  Tempus' Post-Sale Services document, which details Tempus' pricing, projected revenue and profit, plans, and team feedback concerning certain offerings;

    c.  A client-commissioned study based on data, outcomes, and analyses collected, performed, and reviewed by Tempus;

    d.  Proposals for client-commissioned projects, including detailed milestone projections and estimated hours and costs;

    e.  A Life Science Data Deliveries document, covering customer feedback concerning Tempus' quality assurance and quality control efforts, identified success criteria, a detailed path forward identifying short-term and long-term goals, and team feedback and collaborative thoughts on accomplishing identified goals and certain issues presented; and

    f.  A document detailing Tempus' client deliverables, issues warranting resolution related to such deliverables, and Tempus' recommendations and ideas to overcome such issues.

(*Id*. ¶ 97.)

Pawar had no legitimate business reason to access these documents in relation to his then-current role at Tempus. (*Id*. ¶ 98.) And, Pawar especially had no legitimate business purpose to print these documents when he intended to resign the next day. (*Id*.) Historically, Pawar rarely printed documents on Tempus' systems in the course of his employment, and a majority of the documents Pawar did print throughout his employment were personal. (*Id.*)

The documents Pawar accessed and printed contain specific plans, client needs, proposals, pricing, and projections that Tempus carefully crafted and poured substantial sweat equity and

monetary means into to place itself ahead of the competition. (*Id*. ¶ 99.) These documents provide the level of detail a competitor needs to unfairly edge out the competition (*i.e.*, Tempus). (*Id*.) Simply put, these documents could operate as a roadmap to a competitor to undercut Tempus, mirror its plans, and steal its customers. (*Id*.)

### V.      Tempus and Caris Are Direct Competitors

Caris is one of Tempus' main competitors. (*Id*. ¶ 107.) Tempus and Caris are two of the only companies in the world that overlap both as genomic sequencing laboratories and data licensing companies. (*Id*.) These business lines allow each company to offer full integration of their data and sequencing product lines to their customers. (*Id*.) For this reason, Caris is a "double competitor" of Tempus. (*Id*.) Indeed, industry roundtables and publications have routinely discussed Caris and Tempus in a joint manner, highlighting the competitive nature of the two companies. (*Id*. ¶ 108.)

Although it entered the data licensing business after Tempus, Caris seeks to use data and analytics to assist physicians in providing and life sciences companies in advancing precision medicine. (*Id*. ¶ 100.) Like Tempus, two of Caris' primary product lines are 1) its sequencing business; and 2) its data licensing business. (*Id*. ¶ 101.) And, like Tempus, Caris develops and performs genetic sequencing tests to assist physicians in providing precision medicine to their patients. (*Id*. ¶ 102.) Moreover, Caris claims to maintain a library of molecular and clinical data from patient profiles, which it markets to life sciences companies for purposes of research and development. (*Id*. ¶ 103.) Similar to Tempus, Caris sequences patients' genetic information and matches patients to treatments based on their sequencing results. (*Id*. ¶ 106.)

In October 2020, after Tempus had already begun licensing de-identified data to life sciences companies, Caris launched its own version of a real-world, clinical-molecular database called "CODEai." (*Id*. ¶ 104.) Caris claimed its database, like Tempus', "leverages [] extensive

genomic, transcriptomic and proteomic information and matches it with clinical outcomes to take data and transform it to provide never before seen insights into the treatment of cancer by molecular composition." (*Id*.) Today, Caris touts CODEai as the "most comprehensive, real-world data platform integrating Caris' extensive catalog of molecular data with cancer treatment information and clinical outcomes data for more than 390,000 patients covering greater than one million data points per patient." (*Id*. ¶ 105.) In other words, identical to (and after) Tempus, Caris has tried to leverage the data collected from its sequencing business to build a molecular and clinical data library. (*Id*.)

## ARGUMENT

### I.    The Governing Legal Standard Warrants Issuance of a TRO

The Court should exercise its discretion to grant the requested temporary restraining order to prevent further harm to Tempus' protectable business interests. To obtain a TRO, the movant must establish: (1) its case has some likelihood of success on the merits; (2) that no adequate remedy at law exists; and (3) it will suffer irreparable harm if the injunction is not granted. *Long v. Bd. Of Educ.*, 167 F. Supp. 2d 988, 990 (N.D. Ill. 2001). If the Court finds these requirements have been met, it must then consider what harm the nonmoving party will suffer if injunctive relief is granted, balancing such harm against the irreparable harm the moving party will suffer if relief is denied. *Id.* Finally, the Court must consider whether the grant of injunctive relief furthers the public interest. *Id.* Tempus is entitled to a temporary restraining order because this Motion satisfies each element required for issuance of a TRO under Seventh Circuit law.

### II.    Tempus Is Likely to Succeed on the Merits of Its Threatened Trade Secret Misappropriation Claims Under Illinois and Federal Law

Tempus' Verified Complaint establishes a strong *prima facie* case demonstrating Pawar will illegally use and disclose Tempus' trade secrets in violation of the Illinois Trade Secrets Act

("ITSA"), 765 ILCS 1065/1, *et seq*., and the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1831, *et seq*. To establish trade secret misappropriation under the ITSA, a plaintiff must show that "(1) a trade secret existed; (2) it was misappropriated through improper acquisition, disclosure, or use; and (3) the misappropriation damages the trade secret's owner." *Allied Waste Servs. Of N. Am., LLC v. Tibble*, 177 F. Supp. 3d 1103, 1112 (N.D. Ill. 2016). Similarly, "the DTSA creates a private cause of action in favor of the owner of a trade secrets that is misappropriated 'if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce.'" *Mickey's Linen v. Fischer*, 2017 WL 3970593, at *8 (N.D. Ill. Sept. 8, 2017) (quoting 18 U.S.C. § 1836(b)(1)). Both statutes provide for injunctive relief to prevent "threatened misappropriation." *See* 18 U.S.C. § 1836(b)(3); 765 ILCS 1065/3(a). Here, without emergency injunctive relief enjoining Pawar from working for Caris, the clear and present threat posed by his misappropriation of Tempus' trade secret and confidential information will not abate.

> **A.** **Tempus' Customer Information, Strategies, Plans, and Initiatives for Its Data Licensing Business and Biologic Modeling Lab Constitute Trade Secrets**

The highly confidential company information Pawar continually used and accessed in the course of his day-to-day employment duties qualify as protectable trade secrets under Illinois and federal law. The ITSA defines a "trade secret" as:

> [I]nformation, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that: (1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

765 ILCS 1065/2(d).

The definition of a trade secret under the DTSA closely tracks the ITSA's definition. *See* 18 U.S.C. § 1893(3). The Court can accordingly evaluate Tempus' threatened misappropriation claims under both statutes in tandem.

i.  *Tempus' Data Library and Proprietary Software are Trade Secrets*

The trade secrets most at risk of unauthorized disclosure by Pawar include Tempus' closely guarded data library and proprietary software platform. In Pawar's capacity as leader of Tempus' Alliance Management team and managing strategy, operations, and growth in the Data business, he became intimately familiar with the full suite of Tempus' data offerings and how to utilize those offerings most effectively for Tempus' customers. Tempus' data library of clinical and molecular information contains de-identified data relating to more than five million oncology patients, including treatment and outcome information, that is used to enable evidence-based scientific studies. (Ver. Compl. At ¶ 23.) And Tempus' proprietary software aggregates, abstracts, structures, and de-identifies this data to facilitate the deployment of artificial intelligence (AI) at scale. (*Id.* ¶ 21.) The Data Model Tempus has developed—with Pawar's assistance—is a highly customized way to structure de-identified data to make it useful for life sciences researchers. (*Id.* ¶ 62.) Tempus' proprietary platform contains millions of de-identified patient records with multimodal data, including imaging data, matched clinical records linked with genomic information, and full transcriptomic profiles. (*Id.* ¶ 23.)

Tempus' ability to leverage this massive collection of data for commercial use is critical to its success. Specifically, Tempus licenses this data to its life sciences customers to assist in those companies' sustained pursuits of novel therapeutic treatments, clinical trials, and other healthcare innovations. (*Id.* ¶ 25.) Tempus' proprietary technology allows those companies to filter and search Tempus' data library by various metrics—*e.g.*, demographics, genetic biomarkers, and gene expressions—and thereby discover emerging trends, identify clinical patterns, and characterize

-14-

genetic mutations and diseases on a molecular level.  (*Id.*)  Tempus' proprietary technology also enables life sciences researchers to unlock insights from the data that were previously inaccessible, such as creating AI and Machine Learning models to predict future outcomes and responses to therapeutic innovations.  (*Id.*)

This integrated and proprietary data platform, which allows Tempus' customers to operationalize a plethora of scientific information from a myriad of disparate sources, clearly qualifies as a trade secret under the ITSA and DTSA.  *See, e.g.*, *Aon PLC v. Infinite Equity, Inc.*, 2021 WL 4192072, at *13-14 (N.D. Ill. Sept. 15, 2021) (holding economic valuation models that "allow[ed] Aon to quickly and efficiently produce a stock valuation and run EBITDA simulations" constituted trade secrets); *Fire 'Em Up, Inc. v. Technocarb Equip. (2004) Ltd.*, 799 F. Supp. 2d 846, 850 (N.D. Ill. 2011) (finding, *inter alia*, that (i) compilations or combinations of materials necessary to create products or perform certain services, and (ii) programs, methods, techniques and devices used to create products and render services constituted trade secrets).

Importantly, the scientific information housed in Tempus' data library retains competitive and economic value for several years—considering the substantial investment it takes to create the technology, as well as the fact that it takes, on average, at least seven years to bring a new drug to market.  (*Id.* ¶ 26.)  This means the data and insights life-sciences companies obtain through their use of Tempus' proprietary technology would be extremely valuable to a competitor, especially one that tried to enter the market after Tempus.  (*Id.* ¶¶ 26, 100.)  Neither Tempus' data library nor the proprietary software used to analyze the information therein loses value or becomes stale in a short period of time.  *See, e.g.*, *Aon PLC*, 2021 WL 4192072, at *15 (finding Aon showed a strong likelihood of success on the merits of its trade secrets misappropriation claim where defendants "do not demonstrate that the macros and coded formulas used in Aon's valuation models become

stale or lose any value as soon as a particular valuation is completed"); *Walgreens Co. v. Peters*, 2021 WL 3187726, at *5 (N.D. Ill. July 28, 2021) (allowing trade secret misappropriation claim to proceed where "Defendant has not demonstrated how the data [he took from plaintiff] is stale"). If such precious information falls into the hands of a competitor desiring to challenge Tempus' foothold in the industry (*e.g.*, Caris), Tempus' market share would likely diminish while its competitive edge faltered.

ii.    *Tempus' Customer Information Constitutes Trade Secrets*

Pawar's knowledge of Tempus' highly confidential trade secrets does not end with his encyclopedic comprehension of Tempus' data offerings and the operations of its proprietary software platform.  Pawar was so intimately familiar with Tempus' proprietary software that he trained others on its use and function.  He also has extensive familiarity regarding Tempus' customer research and development targets; pricing structures; new product roadmaps; prospective customer identities; and business strategies and forecasting outlooks.  Pawar maintained close relationships with Tempus' customers and therefore understood each customer's research and development interests, as well as their patient targets.  (Ver. Compl. ¶¶ 46-47.)  Pawar trained customers on how to quickly and efficiently navigate the data library.  (*Id.* ¶ 47.)  He relied upon and had access to confidential customer information pertaining to Tempus' current and prospective customers, including Tempus' largest and highest revenue-producing customers.  (*Id.* ¶ 47.)  And through his access to Tempus' Salesforce database, he developed a strong working knowledge of pricing structures, services provided, and customer feedback, among other information.  (*Id.* ¶ 54.)  In short, Pawar was privy to a vast array of customer-specific information, including customers' preferences, pain points, and research targets on the most detailed and granular levels.  (*Id.* ¶¶ 46-47.)

Such confidential customer information is a quintessential example of protectable trade secrets. *See, e.g.*, *Aon PLC*, 2021 WL 4192072, at *16 (finding defendant "appears likely to succeed in proving that the identities of its highest revenue producing clients, client contacts, and client needs and preferences warrant protection as trade secrets"); *Vendavo, Inc. v. Long*, 397 F. Supp. 3d 1115, 1131-32, 1134 (N.D. Ill. 2019) (finding trade secret protection for client contact information and customer-specific information, including "pain points" and "specific solutions developed" for clients); *APC Filtration, Inc. v. Becker*, 646 F. Supp. 2d 1000, 1010 (N.D. Ill. 2009) (discussing the "obvious and well recognized" value of customer and potential customer contact information as well as customer-specific information as to product preferences).

### iii. *Pawar Had Direct Access to Tempus' Business Plans and Operational Capabilities*

Further, upon his promotion to Tempus' Head of Data Product Strategy in July 2021, Pawar took on an expanded slate of responsibilities that enabled him to play an influential role in formulating the company's strategic initiatives. The Court need not look beyond Pawar's LinkedIn page for evidence of his new duties in that role where he was charged with "long range planning," Tempus' "data product roadmap to grow and improve Tempus' data and AI offerings," and "assessment, design and tactical execution of multi-quarter initiatives." (Ver. Compl. ¶ 59.) This new role focused principally on data growth and strategy. (*Id.* ¶ 60.) Pawar leveraged the lessons he learned leading the Data Partnerships Program and managing the Alliance Management Team and consequently used that experience to enhance Tempus' Data business and diversify its offerings to customers. (*Id.* ¶ 60.)

Moreover, by collaborating with different teams across Tempus as the Head of Product Strategy, Pawar learned more about Tempus' product development, engineering, and the planned trajectory of the business. (*Id.* ¶ 61.) In his own words, Pawar worked with and had knowledge

-17-

of "data growth," "customer success" and "data provisioning functions." (*Id.*) Through his various roles with Tempus over a number of years, Pawar amassed an innate knowledge of the most confidential and valuable aspects of Tempus' business. And even after his promotion, Pawar still maintained the same high-level access to Tempus' customer-specific data while he managed the Modeling Lab's Project Managers. (*Id.* ¶¶ 64, 67.) Notably, many of the documents Pawar printed on April 20, the day before he resigned and his last day, pertained to this exact type of customer-specific data, pricing guidelines, and future proposals. (*Id.* ¶ 97.) This confidential company information regarding strategic initiatives, roadmaps, and long-term growth and forecasting outlooks also constitutes trade secrets. *See, e.g.*, *Groupon, Inc. v. Shin*, No. 21-cv-6082, 2022 WL 60526, at *5 (N.D. Ill. Jan. 6, 2022) (explaining defendant former employee had access to plaintiff's trade secrets such as margins, road maps, company research, and "exposure to the inner workings" of defendant); *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1265-66 (7th Cir. 1995) (holding strategic company goals including pricing, distribution, marketing plans, funding plans for specific markets, and plans regarding innovations in sales and delivery systems constituted trade secrets); *Inmar, Inc. v. Vargas*, No. 18-cv-2306, 2018 WL 6716701, at *3 (N.D. Ill. Dec. 21, 2018) (finding business development plans and marketing and pricing strategies constituted trade secrets); *NAV Consulting, Inc. v. Kumawat*, No. 1:22-CV-03624, Mem. Op. & Order (Dkt. 112), at 22-24 (N.D. Ill. Mar. 31, 2023) (holding plaintiff's business plans and expansion strategies were trade secrets).

In his final role for Tempus, Pawar worked as the company's Senior Director, Data Growth & Operations Strategy. (Ver. Compl. ¶ 64.) The Modeling Lab's sales team is responsible for securing customer contracts to grow tumor organoids and uses "other novel technological applications" in Tempus' physical "wet lab" for targeted drug screening, research and

development. (*Id.* ¶ 65.) These organoid projects frequently combine the organoid "wet lab" work with Tempus data, as life sciences companies seek to further delve into the data they license from Tempus by performing experiments to further test the insights they have derived. (*Id.*)

Again, to use Pawar's own words, the Modeling Lab "supports R&D for [Tempus'] pharma and biotech partners through biomarker diversity, drug candidate assessment, and pipeline prioritization" and "these studies may … bring about positive change in the therapeutic options for the patients [Tempus] serve[s]." (*Id.* ¶ 66.) As Senior Director, Data Growth & Operations Strategy, Pawar managed the Modeling Lab's project managers, which provided him with a high-level view and understanding of the Modeling Lab's full scope of operations, as well as the highly confidential research priorities of Tempus' customers. (*Id.* ¶¶ 64, 67.) In addition to the Modeling Lab's ongoing projects and programs in the works, Pawar had access to the equipment used in the Lab, and he approved all Statements of Work for each customer. (*Id.* ¶ 67.) Pawar's oversight of the Modeling Lab further expanded his knowledge of Tempus' Data business because the research, data, and information gleaned from the Modeling Lab expands the ever-growing and rapidly evolving contents of the data library. (*Id.* ¶ 29.)

The operational workings of Tempus' Modeling Lab also constitute trade secret information. *See PepsiCo*, 54 F.3d at 1269 (finding "particularized plans or processes" developed by defendant and exposed to plaintiff "while the employer-employee relationship existed, which are unknown to others in the industry and which give the employer and advantage over [its] competitors" were trade secrets).

iv.    *Tempus Invests in and Protects Its Trade Secrets*

In developing the trade secrets described in detail herein, Tempus has invested significant financial resources, years of trial and error, and sweat equity to build one of the world's most detailed libraries of molecular and clinical data. (Ver. Compl. ¶ 33.) To meet its customers' highly

-19-

specialized needs and thereby establish a beachhead in this competitive marketplace, Tempus has tirelessly devoted resources toward the development and maintenance of proprietary technologies, confidential information, and trade secrets. (*Id.* ¶ 34.) It has raised more than $1 billion, which it has invested in substantial research and development efforts. (*Id.* ¶ 31.)

Tempus also derives independent economic value from these Tempus-created and non-public systems and products. (*Id.* ¶ 26.) And, of course, Tempus' reservoir of client-specific preferences provides it with a competitive edge that it has meticulously refined over time. (*Id.* ¶ 31.) These considerations form the hallmarks of trade secrets. *See, e.g.*, *Inmar, Inc.*, 2018 WL 6716701, at *3 (finding plaintiff's confidential information constituted trade secrets where "it spent years and millions of dollars developing its knowledge of products and influencers" and "the information is not readily ascertained or generally known"); *RKI, Inc. v. Grimes*, 177 F. Supp. 2d 859, 874 (N.D. Ill. 2001) (finding confidential customer data met the test "for information sufficiently secret to derive economic value from not being generally known to others who can obtain economic value from its disclosure or use").

Tempus also implements reasonable measures to protect the strict confidentiality of the trade secrets described herein. Tempus requires its employees to sign non-disclosure and confidentiality agreements. (Ver. Compl. ¶ 36.) It limits access to its confidential information and trade secrets to designated levels of employees depending on their duties and responsibilities. (*Id.*) And it uses multiple security systems to protect this information. For instance, all Tempus confidential information is password-protected and requires two-factor authentication. (*Id.* ¶ 37.) Additionally, Tempus leverages multiple third-party software systems to protect the integrity of its proprietary systems and customer data: Okta (which manages all user accounts and authentication); Crowdstrike (which monitors endpoint security for potential breaches and

unauthorized use of information); WorkspaceOne (which manages all endpoint device settings to prohibit unauthorized usage); and Tanium (which provides advanced threat detection and response capabilities for endpoints). (*Id.*)

Tempus also requires employees to attend trainings and affirm their commitment to Tempus' code of conduct and other core non-disclosure policies. (*Id.* ¶ 38.) And indeed, Pawar signed employment agreements with Tempus in which he promised to keep its trade secrets confidential. (*Id.* ¶¶ 72, 78, 90.) These extensive measures are reasonable and sufficient to establish trade-secret protection under Illinois law. *See, e.g.*, *Vendavo*, 397 F. Supp. 3d at 1136 (holding plaintiff made reasonable efforts to protect its trade secrets by limiting access to sensitive areas and databases holding documents containing trade secrets, and requiring employees to sign non-disclosure agreements); *RKI*, 177 F. Supp. 2d at 874-75 (finding plaintiff had taken reasonable measures to maintain secrecy by providing access on a password-protected computer database and requiring employees to sign non-disclosure policy); *Strata Mktg., Inc. v. Murphy*, 317 Ill. App. 3d 1054, 1069 (1st Dist. 2000) (finding reasonable means of protecting trade secrets included "keeping information under lock and key, limiting computer access and requiring confidentiality agreements or other efforts by the employer to advise its employees that information imparted to them must remain confidential") (internal citations omitted).

> **B.** **The Evidence Strongly Indicates Pawar Will Disclose and Use Tempus' Trade Secrets In His Substantially Similar Role for Tempus' Main Competitor**

Pawar has already physically taken a trove of Tempus' trade secrets, and he cannot help but rely on additional secrets by nature of his work at Caris. Illinois courts allow trade secret misappropriation claims to proceed on an inevitable disclosure theory, which enables a plaintiff to "prove a claim of trade secret misappropriation by demonstrating that defendant's new employment will inevitably lead him to rely on the plaintiff's trade secrets." *PepsiCo, Inc. v.*

*Redmond*, 54 F.3d 1262, 1269 (7th Cir. 1995); *accord Strata Mktg.*, 317 Ill. App. 3d at 1070 ("*PepsiCo* correctly interprets Illinois law …."). Courts in this District have repeatedly analyzed inevitable disclosure claims under both the ITSA and DTSA, "which suggests that the doctrine is available in either context." *Packaging Corp. of Am., Inc. v. Croner*, 419 F. Supp. 3d 1059, 1069 n.7 (N.D. Ill. 2020) (citing cases); *see also Groupon*, 2022 WL 60526, at *3-6 (analyzing inevitable disclosure claim under both statutes); *NAV Consulting*, *supra*, Dkt. 112 at 17-18. To prevail, the plaintiff must demonstrate "that the employee 'cannot operate without inevitably disclosing the confidential information.'" *Id.* (quoting *Complete Bus. Sols., Inc. v. Mauro*, 2001 WL 290196, at *6 (N.D. Ill. Mar. 16, 2001)).

When evaluating whether the disclosure of trade secrets is inevitable, courts consider three factors: "(1) the level of competition between the former and new employer; (2) whether the employee's new position is comparable to the position he held with the former employer; and (3) the actions of the new employer to prevent the employee from using or disclosing trade secrets of the former employer." *Aon PLC*, 2021 WL 4192072, at *18 (citation omitted). Courts afford less weight to the third factor, however, because "a complaint is not likely to contain any allegations about what, if anything, the competitor did to safeguard the plaintiff's secrets." *Molon Motor & Coil Corp. v. Nidec Motor Corp.*, 2017 WL 1954531, at *5 (N.D. Ill. May 11, 2017).

### i. *Caris is Tempus' Direct Competitor*

The evidence before the Court establishes Pawar's threatened misappropriation of Tempus' trade secrets under the inevitable disclosure framework. <u>First</u>, Tempus and Caris are direct competitors in a highly specialized sector. Caris is not just some run-of-the-mill competitor trying to make a name for itself. Unlike other healthcare data businesses, Tempus and Caris are the only two companies *in the world* that overlap both as genomic sequencing laboratories and data licensing companies, which allows them to offer full integration of their data and sequencing

product lines to their customers.  (Ver. Compl. ¶ 107.)  And in October 2020, Caris tried to launch its own proprietary version of a real-world, clinical molecular database named "CODEai"— several years after Tempus launched its own platform.  (*Id.* ¶ 104.)  The language on the Caris website even mimics Tempus' website.  (*Id.* ¶ 110.)  At the end of the day, Caris has emulated Tempus' business model by leveraging data collected from its sequencing business to construct a molecular and clinical library.  (*Id.* ¶¶ 104, 106.)  This operational symmetry makes Caris a "double competitor" of Tempus.  (*Id.* ¶ 107.)

      ii.    *Pawar's Role at Caris Mirrors His Former Roles at Tempus*

Second, Caris has hired Pawar to function exactly as he did at Tempus.  Effective May 1, 2023, Pawar serves as Caris' Vice President, Data Strategy and Solutions.  (*Id.* ¶ 111.)  As Pawar admitted to Tempus, he is "getting back into data," and he acknowledged to his former Tempus colleagues that Caris hired him to perform a similar, data-focused role at Caris.  (*Id.* ¶ 113.)  Of course, working as Caris' Vice President, Data Strategy and Solutions and "getting back into data" means Pawar will be called on to perform duties identical to those he discharged as Head of Tempus' Alliance Management Team, in which he developed a comprehensive understanding of Tempus' entire Data business over the course of several years.  So naturally, Pawar "learn[ed] what works and what doesn't" when it comes to operationalizing a molecular and clinical data library while refining a proprietary software platform to maximize the library's effectiveness for life sciences customers. *Groupon*, 2022 WL 60526, at *5 (noting "what you learn of importance stays with you intrinsically even though you may not remember specific numbers"); *see also PepsiCo. v. Redmond*, 1996 WL 3965, at *19 (N.D. Ill. Jan. 2, 1996) ("it is very difficult for the human mind to compartmentalize and selectively suppress information once learned, no matter how well intentioned the effort may be to do so").  This means he will undoubtedly use his deep knowledge of Tempus' trade secrets to improve Caris' CODEai product and other data platforms

to better serve and market to Caris' current and prospective customers and thereby cut into Tempus' market share. (Ver. Compl. ¶ 113.)

Caris should not be permitted to benefit from Pawar's duplicity. If allowed to proceed, Caris will not have to expend the same laborious trial-and-error processes—as Tempus did—to create optimally efficient and user-friendly products for its customers in a highly competitive marketplace. Why else would Caris have agreed to pay Pawar a $100,000 pay increase over his current Tempus salary? (*Id.* ¶114.) Pawar adds little value as a new hire unless he is willing to draw upon Tempus' trade secrets to help Caris achieve success in its hard-fought battle for greater market share and influence in the industry. Pawar's acceptance of a nearly identical position in Caris' data licensing sector therefore weighs strongly in favor of Tempus' inevitable disclosure case. *See, e.g.*, *Liebert Corp. v. Mazur*, 357 Ill. App. 3d 265, 284 (1st Dist. 2005) ("If a former employee fulfills a substantially similar position with the plaintiff's competitor, the plaintiff has a better chance of succeeding under this [inevitable disclosure] theory." (citing *Strata Mktg.*, 317 Ill. App. 3d at 1070)).

### iii. *Caris Has Not Taken Any Measures to Protect Tempus' Trade Secrets*

<u>Third</u>, Caris has not taken any measures to prevent Pawar's unlawful disclosure of Tempus' trade secrets. Nor could it. Given the expansive scope of Pawar's mandate in his new role, it will be impossible for him to perform effectively without using or disclosing Tempus' trade secrets.

Caris hired Pawar to lead a team purposed to improve its existing data products while developing new ones to challenge Tempus' preeminence. If anyone has the skills and know-how essential to accomplish this goal, it is Pawar. He has direct knowledge of Tempus' data offerings, future products, and planned technological innovations, as well as the proprietary processes and confidential analysis driving those products and innovations. He also knows Tempus' highest-revenue customers and has developed a keen understanding of Tempus' customers' pain points

-24-

and unique preferences.  As a result, Pawar will necessarily rely upon his unmatched knowledge of Tempus' R&D initiatives, its data products' strengths and weaknesses, and how best to serve Caris' customers' needs.  The third inevitable-disclosure factor also weighs strongly in Tempus' favor.

iv. *Pawar Will Inevitably Disclose Tempus' Trade Secrets to Caris*

The Seventh Circuit's decision in *PepsiCo* illustrates the predicament Tempus faces here. *PepsiCo* occurred "against a backdrop of fierce beverage-industry competition between Quaker and PepsiCo, especially in 'sports drinks' and 'new age drinks.'"  *PepsiCo*, 54 F.3d at 1263-64. Like other management employees, the individual defendant in that case (Redmond) had signed a confidentiality agreement and occupied a high-level position at PepsiCo that "gave him access to inside information and trade secrets." *Id.* at 1264.  But Redmond subsequently accepted a position with Quaker as VP–Field Operations for Gatorade.  *Id.*

In affirming an injunction forbidding him from assuming his new role at Quaker, the Seventh Circuit noted that PepsiCo had presented "substantial evidence" to the district court "that Redmond possessed extensive and intimate knowledge about PCNA's strategic goals for 1995 in sports drinks and new age drinks." *Id.* at 1269.  The district court had concluded "that unless Redmond possessed an uncanny ability to compartmentalize information, he would necessarily be making decisions about Gatorade and Snapple by relying on his knowledge of PCNA's trade secrets." *Id.*  And the Seventh Circuit agreed, crediting PepsiCo's assertion "that Redmond cannot help but rely on PCNA trade secrets as he helps plot Gatorade and Snapple's new course, and that these secrets will enable Quaker to achieve a substantial advantage by knowing exactly what PCNA will price, distribute and market in sports drinks and new age drinks and being able to respond strategically." *Id.* at 1270.  Thus, the "danger of misappropriation" was PepsiCo's reasonable fear "that Quaker, unfairly armed with knowledge of PCNA's plans, will be able to

-25-

anticipate its distribution, packaging, pricing, and marketing moves." *Id.* The Seventh Circuit also noted Redmond's lack of candor with PepsiCo about his new role and the district court's reluctance to believe he would refrain from disclosing trade secrets (or that Quaker would ensure he did not disclose them). *Id.* at 1270-71.

*PepsiCo* is materially on-point with respect to the facts of this case. Like Redmond, Pawar occupied a high-level position with Tempus where he signed a confidentiality agreement and was privy to trade secrets relating to operational details and strategic plans for achieving commercial success in a highly specialized, niche industry with only 2-3 major competitors. Further, like Redmond, Pawar showed a shocking of lack of candor in lying about his alleged immigration-based need for a California agreement and then printing a trove of trade secrets documents. Then, he abruptly resigned and decided to join a direct competitor in a substantially similar role where he cannot help but rely on Tempus' trade secrets as he charts a new course for Caris in the latter's quest to challenge Tempus for more market dominance.

Armed with knowledge of Tempus' valuable trade secrets through its latest hire, Caris will be able to anticipate Tempus' strategic moves and transform its new and existing data offerings based on lessons Pawar learned during his tenure. Similar to *PepsiCo*, Tempus "finds itself in the position of a coach, one of whose players has left, playbook in hand, to join the opposing team before the big game." 54 F.3d at 1270. Barring the ability to wall off his embedded knowledge of Tempus' trade secrets—an impossibility that is contrary to human nature—Pawar will inevitably rely on those secrets for Caris' benefit and to Tempus' detriment.

Indeed, courts in inevitable disclosure cases recognize the self-evident maxim that "once a person has knowledge of a competitor's business information, when they are called upon to act on behalf of his own company, his ability to compartmentalize the knowledge on his competitor's

-26-

[information] is nigh impossible." *PepsiCo*, 1996 WL 3965, at *19 (cleaned up); *accord Groupon*, 2022 WL 60526, at *5 ("[Defendant's] testimony that he learned nothing of value while at [his former employer] is unworthy of belief. Learning is an ongoing process.") To the extent Pawar or Caris insists otherwise, such assertions are "simply not believable" and warrant no credence. *See Groupon*, 2022 WL 60526, at *5-6 (granting preliminary injunction in inevitable disclosure case).

Here, no abstract legal rule defeats the basic common-sense notion that humans learn from their experiences and adapt their behaviors accordingly to meet new challenges in daily life.[1] The inevitable disclosure doctrine is powered by the idea that courts should prevent the unauthorized disclosure of trade secrets even if they only reside in the memories of a former employee with a propensity to use them with hostile intent. *See also Vendavo*, 397 F. Supp. 3d at 1139 (stating "the prohibition against using the trade secrets applies regardless of whether the information is stored in electronic form, or simply resides in one's head"); *Aon PLC*, 2021 WL 4192072, at *19 (finding likelihood of success on merits of plaintiff's inevitable disclosure claim where defendants had not "shown that they can divorce this critical competitive information from their memories when targeting and servicing former Aon equity compensation for [their new employer]"); *NAV Consulting*, *supra*, Dkt. 112 at 18 ("[I]t is true, as NAV argues, that under the inevitable-disclosure doctrine, [defendant] would inevitably rely on trade-secret information learned at NAV, . . . .").

There is no evidence Pawar is willing or equipped to wipe Tempus' trade secrets from his mind given his new role. The opposite is true. The preliminary record evidence demonstrates malfeasance and corrupt intent.

---

[1] *Cf.* Oliver Wendell Holmes, Jr., THE COMMON LAW 1 (1881) ("The life of the law has not been logic: it has been experience.").

v. *Pawar Engaged in Improper and Concerning Pre-Resignation Conduct*

Further, Pawar is not entitled to the benefit of any residual doubt given his troubling pattern of conduct immediately before his resignation. Two episodes stand out. First, on April 6, 2023, Pawar signed a new employment agreement with Tempus after he lied to Tempus' immigration attorney and its People Team regarding his purported need for a new agreement to address a request from the USCIS. (Ver. Compl. ¶¶ 84-90) Pawar asked Tempus' People Team if "the revised California CIPRA," which did not contain any non-competition provisions, "supersedes the original one," which did have a non-compete. (*Id.* ¶ 91.) Tempus confirmed it did. (*Id.*) Despite Tempus' express request for a copy of USCIS's RFE corroborating Pawar's representations, Pawar never provided it. (*Id.* ¶ 89.) Even more suspiciously, on April 20, 2023—one day before Pawar resigned and his last day of employment with Tempus—he printed several highly confidential and competitively sensitive documents containing Tempus' pricing and pricing guidelines, customer-specific information, project proposals, and statements of work, among other proprietary documents and information. (*Id.* ¶ 97.) Pawar notably had no legitimate business reason to access or print these documents in his then-current role as Senior Director, Data Growth and Operations Strategy. (*Id.* ¶ 98.) And, his printing on April 20, 2023 differed drastically from his historical printing practices at Tempus. (*Id.*) The next day (April 21, 2023), Pawar tendered his resignation for a new role with a competitor and left Tempus' employ immediately. (*Id.* ¶ 95.) Pawar acknowledged his new role would be similar to ones he previously held at Tempus, especially relating to "data." (*Id.* ¶ 7.) Indeed, effective May 1, 2023, Pawar accepted a role with Caris as its Vice President, Data Strategy and Solutions. (*Id.* ¶ 111.)

These deceitful and surreptitious actions by Pawar in the final days of his tenure belie any self-serving explanations he may trot out in attempting to excuse or justify his brazen conduct. *See, e.g.*, *Mickey's Linen*, 2017 WL 3970593, at *13 ("[C]ase law supports discounting

[defendant's] claim that he would not or could not use or divulge Mickey's trade secrets in the performance of his job at [new employer], given his 'history of deceit.'" (quoting *Lakeview Tech., Inc. v. Robinson*, 446 F.3d 655, 656-58 (7th Cir. 2006))); *Liebert Corp.*, 357 Ill. App. 3d at 282-83 (reversing denial of injunction on inevitable disclosure grounds where plaintiff's former employee downloaded confidential data shortly before resigning and after agreeing to work for a competitor); *RKI*, 177 F. Supp. 3d at 868, 875-77 (finding former employee would inevitably disclose plaintiff's trade secrets where he had stolen company information two days before his resignation and after accepting a nearly identical role for plaintiff's competitor). Any bid to save his own skin should be taken with a grain of salt.

In sum, Pawar "could not be trusted to act with the necessary sensitivity and good faith under the circumstances in which the only practical verification that he was not using [Tempus'] secrets would be [his] word to that effect." *PepsiCo*, 54 F.3d at 1270. That ship sailed when he spun a pretextual tale to Tempus about his need for a new employment agreement and then stole confidential company documents on his way out the door.

Pawar has already shown a propensity to disclose Tempus' trade secrets. And it would strain credulity for Pawar or Caris to deny that Pawar "might be faced with a decision that could be influenced by certain confidential information that he obtained while at [Tempus]." *Id.* Tempus has demonstrated a strong likelihood of success on the merits of its threatened misappropriation claims under the ITSA and DTSA.

### III.     Tempus Will Suffer Irreparable Harm in the Absence of a TRO

Tempus has no adequate remedy at law and will continue to suffer irreparable harm as a result of Pawar's illegal conduct unless the Court issues a TRO. Even with a showing of likelihood of success on the merits here, Tempus "must also demonstrate that irreparable harm is 'likely' if the Court denies its motion" for injunctive relief. *Groupon*, 2022 WL 60526, at *6 (citing *Winter*

*v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)).  Tempus faces substantial risk of losing customers and market share due to Pawar's inevitable disclosure of its trade secrets, and "it is precisely the difficulty of pinning down what business has been or will be lost that makes an injury 'irreparable.'" *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 546 (7th Cir. 2021) (quoting *Hess Newmark Owens Wolf, Inc. v. Owens*, 415 F.3d 630, 632 (7th Cir. 2005)).  And, here, the full extent of Tempus' injuries are not easily ascertainable and will persist so long as Pawar works for Caris, and "it would almost be impossible to calculate the extent of the harm."  *Groupon*, 2022 WL 60526, at *6 ("Such harm cannot generally be easily quantified; and therefore, if disclosure is likely, the employer lacks an adequate remedy at law.") (citing *Diamond Blade Warehouse, Inc. v. Paramount Diamond Tools, Inc.*, 420 F. Supp. 2d 866, 872 (N.D. Ill. 2006)); *see also Life Spine*, 8 F.4th at 546 (finding that "identifying and quantifying lost business would be especially difficult for" plaintiff and affirming grant of injunction on trade secrets misappropriation claim).

Pawar's employment with Caris, his theft of company data on the eve of his resignation and last day of Tempus employment, his duplicity in crafting his resignation, and the likelihood he will imminently use and disclose Tempus' trade secrets, all will cause ongoing harm for which monetary damages will not suffice.  *See, e.g.*, *E*TRADE Fin. Corp. v. Pospisil*, 2018 WL 4205401, at *5 (N.D. Ill. Sept. 4, 2018) (finding no adequate remedy at law for employee who used misappropriated trade secret information to compete with former employer because "ongoing competition itself" constitutes "a sufficient basis for relief"); *HCA Franchise Corp. v. Alisch*, 2016 WL 10706285, at *7 (N.D. Ind. Aug. 12, 2016) (former employer had no adequate remedy at law for former employee's misappropriation of trade secrets because "monetary damages are insufficient to compensate for trade secret misappropriation").  Further, any damage to Tempus' reputation and goodwill or erosion of its competitive position to a "double competitor" like Caris

would also be irreparable. *See Aon PLC*, 2021 WL 4192072, at *28 (finding irreparable harm in inevitable disclosure case under similar facts); *Mickey's Linen*, 2017 WL 3970593, at *18 (holding loss of competitive position justifies preliminary injunctive relief).

### IV. The Balance of Hardships Strongly Favors Tempus and The Issuance of a TRO Will Not Disserve the Public Interest

The balance of hardships also weighs in Tempus' favor given the clear and actual threat Pawar's employment with Caris presents here. Enjoining Pawar from working in a nearly identical position for Caris in order to prevent misappropriation of Tempus' confidential and trade secret information would not harm the public interest.

In determining whether to grant a preliminary injunction, courts "weigh[] the harm of denying an injunction [to the moving party] against the harm to [the non-moving party] of granting one." *Groupon*, 2022 WL 60526 at *6. The Seventh Circuit "employs a sliding scale approach for this balancing: if a movant is more likely to win, the balance of hardships can weigh less heavily in its favor, but the less likely a movant is to win the more that balance would need to weigh in its favor." *W. Capra Consulting Grp., Inc. v. Snyder*, 2019 WL 3935045, at *7 (N.D. Ill. Aug. 20, 2019) (internal citations and quotations omitted); *see also Life Spine*, 8 F.4th at 539 ("If the plaintiff is likely to win on the merits, the balance of harms need not weigh as heavily in his favor."). And, "[i]n balancing the harms, the Court also considers the public interest." *Groupon*, 2022 WL 60526 at *6 (internal citation omitted).

Here, Tempus presents a strong likelihood of success on the merits of each of its threatened trade secret misappropriation claims against Pawar, and the balance of harms also favors Tempus. The requested injunctive relief seeks only to ensure Pawar abides by his statutory duties under Illinois and federal law. He is free to seek other employment, just not in a role substantially similar to the one he held at Tempus and which puts Tempus' confidential and trade secret information at risk of

-31-

inevitable disclosure. Because the potential harm to Tempus stemming from Pawar's employment with Caris and his inevitable use of Tempus' trade secret information is great and incalculable here—while the potential harm to Pawar is negligible, the balance of harms weighs in favor of injunctive relief. *See, e.g.*, *Brunswick Corp. v. Jones*, 784 F.2d 271, 275 (7th Cir. 1986) (balance of irreparable harms weighed "heavily" in employer's favor where former employee possessed confidential information directly relevant to new position with competitor); *Mickey's Linen*, 2017 WL 3970593, at *19 (finding, in inevitable disclosure case, that balance of harms favored plaintiff who "stands to suffer considerable non-compensable and/or uncollectable losses if an injunction were denied"); *Lakeview Tech.*, 446 F.3d at 657-58 (finding balance of harms favored plaintiff in inevitable disclosure case where plaintiff would be subject to "substantial injury" without an injunction). Pawar was also a highly compensated employee. (Ver. Compl. ¶¶ 64, 69, 73.)

Finally, entering a TRO to prevent misappropriation of trade secrets will not disserve the public interest. It is well-settled that the public interest "favors the protection of trade secret and confidential information gathered and developed by a company at significant expense." *Groupon*, 2022 WL 60526, at *7. The public interest also favors *fair* competition in markets that can be achieved without the improper use of confidential information or trade secrets to damage a close competitor's competitive edge. *See Aon PLC*, 2021 WL 4192072, at *32 (finding public interest favored injunction to prevent defendant's inevitable disclosure of plaintiff's trade secrets). Further, the public interest would be served by an injunction because Pawar still retains the right "to work [successfully] in his chosen field." *Mickey's Linen*, 2017 WL 3970593, at *19 (quoting *Brown & Brown, Inc. v. Ali*, 592 F. Supp. 1009, 1046 (N.D. Ill. 2009); *see also Lucini Italia Co. v. Grappolini*, 2003 WL 1989605, at *18 (N.D. Ill. April 28, 2003) (public interest was served by issuance of an injunction protecting plaintiff from future misuse of its trade secret information).

All relevant factors weigh in favor of granting Tempus the emergency injunctive relief it so desperately needs at this time. The Court should accordingly issue a TRO that enjoins Pawar from working for Caris in any capacity, and further set an appropriate schedule for an evidentiary hearing to determine Tempus' entitlement to a preliminary injunction in this matter.

### CONCLUSION

Through this Motion, Tempus' contemporaneous Motion for Expedited Discovery, and Tempus' Verified Complaint, Tempus respectfully asks this Court: (i) to permit the parties to engage in limited expedited discovery prior to a preliminary injunction hearing; (ii) to schedule this matter for preliminary injunction hearing as soon as its schedule permits following a period of expedited discovery; (iii) upon completion of the hearing, to enter a preliminary injunction enjoining Caris from employing Pawar consistent with his statutory obligation not to use or disclose Tempus' protectable trade secrets; and (iv) upon completion of the hearing, to enter a preliminary injunction enjoining Pawar from using or disclosing Tempus' trade secrets and confidential information, pursuant to the prohibitions promulgated by the ITSA and DTSA.

Dated:  May 10, 2023

Respectfully submitted,

TEMPUS LABS, INC.

By:  /s/ *Kevin M. Cloutier*

One of Its Attorneys

Kevin M. Cloutier (6273805)
Mikela T. Sutrina (6311408)
David M. Poell (6302765)
SHEPPARD MULLIN RICHTER & HAMPTON LLP
321 N. Clark Street, 32nd Floor
Chicago, Illinois 60654
Tel: (312) 499-6300
Fax: (313) 499-6301
kcloutier@sheppardmullin.com
msutrina@sheppardmullin.com
dpoell@sheppardmullin.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 10, 2023, I sent copies to the foregoing document via e-mail

and U.S. mail, postage prepaid to the following:

William M. Gantz
Duane Morris LLP
190 South LaSalle Street, Suite 3700
Chicago, IL 60603-3433
BGantz@duanemorris.com
*Attorney for Defendant*

/s/*Mikela T. Sutrina*
One of the Attorneys for Plaintiff